CITY OF LYNN *vs.* LABOR RELATIONS COMMISSION;
INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,
LOCAL 739, intervener.

No. 93-P-810.

Suffolk. January 17, 1995. - July 17, 1997.

Present: ARMSTRONG, KASS, & GILLERMAN, JJ.

*Public Employment,* Collective bargaining, Accidental disability retirement, Retirement, Managerial prerogative. *Labor,* Public employment, Collective bargaining. *Fire Fighter,* Retirement.

Discussion of the nature of the authorizing statutes or other laws under which public managers act, including G. L. c. 150E, § 7(*d*), and municipal personnel ordinances, general authorizing statutes, and specific authorizing statutes not listed in § 7(*d*), and consideration whether, under each category, certain actions are subject to collective bargaining and arbitration. [176-182]

Where a fire chief acted pursuant to a specific, statutory mandate, G. L. c. 32, § 16(1)(*a*), that is not listed in G. L. c. 150E, § 7(*d*), to file with the retirement board an application for the superannuation retirement of an employee who had been disabled from working as a fire fighter for five years, there was no obligation to submit the matter to collective bargaining and the Labor Relations Commission erred in finding a prohibited practice in the fire chief's action. [182-184]

APPEAL from a decision of the Labor Relations Commission.

*David F. Grunebaum* for the city of Lynn.

*Tammy Brynie* for the Labor Relations Commission.

*Ruth A. Bourquin* for Local 739, International Association of Firefighters.

ARMSTRONG, J. The city of Lynn appeals from a decision of the Labor Relations Commission finding the city chargeable with prohibited practices when its fire chief applied for and thereby caused the superannuation retirement of a firefighter in 1989.

The relevant background began on March 8, 1984, when

Lynn firefighter Charles Curley slipped on an oil spot in the firehouse while running to answer a phone. His right knee, twice before injured in accidents (once when he slipped on ice, again when he slid down the firehouse pole and landed hard), was now seriously injured and required surgery in 1984 and again in 1985. He did not return to work after the March, 1984, accident and was placed on injured leave under G. L. c. 41, § 111F. That section provides full pay and benefits for a firefighter injured in the line of duty, plus, under § 100, all medical expenses. See *Eyssi* v. *Lawrence*, 416 Mass. 194, 198 (1993). By the terms of the statute, § 111F status is terminated when the firefighter is retired or is certified by a city-designated physician to be no longer incapacitated.

In April, 1986, told by his physicians that he had reached a medical plateau, Curley applied for accidental disability retirement under G. L. c. 32, § 7, a form of retirement that provides higher benefits than ordinary (superannuation) and disability (nonservice-connected) retirement. General Laws c. 32, § 5 and § 6, respectively. See discussion in *MacDonald* v. *Commissioner of the Metropolitan Dist. Commn.*, 33 Mass. App. Ct. 455, 459-460 (1992). Accidental disability retirement requires certification by a medical panel that the employee is permanently and totally disabled and that the disability "is such as might be the natural and proximate result of the accident . . . on account of which [accidental disability] retirement is claimed . . . ." G. L. c. 32, § 6(3)(*a*), as amended through St. 1987, c. 697, § 32. *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 761-764 (1993). The panel that examined Curley did not so find; rather, it expressed the view that Curley was overweight and out of shape, and that, while he had degenerative arthritis in his knee, if he underwent a weight reduction program and did exercise to limber up his knee, his acknowledged disability might well prove temporary. On this basis, the Lynn retirement board denied Curley's application, but on May 31, 1988, the Contributory Retirement Appeal Board (CRAB) remanded to the medical panel and the Lynn board for reconsideration and clarification. The medical panel reexamined Curley on September 12, 1988, finding this time (two years later) that Curley was permanently and totally disabled but,

based, apparently,[1] on a view that Curley's accident would not have resulted in permanent disability if he had given rehabilitation a fair try, again refused to certify the possibility that his disability was the result of the accident. The Lynn retirement board, on November 29, 1988, again voted to deny Curley's application, and Curley again appealed to CRAB.

At this point Lynn's fire chief, notified of the denial, told Curley that unless he (Curley) filed an application for superannuation retirement within one week, he (the fire chief) would file an application for Curley's involuntary superannuation retirement, a power given to the chief by G. L. c. 32, § 16(1)(a).[2] See *MacDonald*, 33 Mass. App. Ct. at 460. The president of Curley's union (Local 739, International Association of Firefighters) interceded with the chief to try to persuade him to withhold filing for the involuntary superannuation retirement as long as Curley's appeal to CRAB remained unresolved. The parties acknowledge that CRAB appeals were then backlogged and that the resultant delay could have been expected to take, as it was in fact to take, two years or more to process. The fire chief refused, and the Lynn retirement board, acting on the chief's application, retired Curley involuntarily for superannuation on January 10, 1989. From that time until CRAB, reversing the Lynn board, approved Curley's accidental

---

[1]The medical panel's report has not been included in the record, and the administrative law magistrate's recommended (to CRAB) decision, which discusses it at length, has been included only in part in the record. The omissions are not material to the appeal.

[2]Section 16(1)(a), as amended through St. 1982, c. 630, § 21, in pertinent part, states: "Any head of a department who is of the opinion that any member employed therein should be retired for superannuation, ordinary disability or accidental disability, in accordance with the provisions of section five, six, or seven, as the case may be, may file with the [local retirement] board on a prescribed form a written application for such retirement. Such application shall include a fair summary of the facts upon which such opinion is premised." Other provisions of § 16 give the member (i.e., the employee) a right to a hearing before the local retirement board, subject to review by a court of a board decision approving the retirement. The test, assuming the employee meets the length-of-service criteria for a superannuation pension, is whether the retirement is "justified." See § 16(2), (3)(a). In Curley's case, there was no realistic chance of establishing that the retirement was unjustified because of Curley's extended absence from work, then almost five years.

disability retirement, Curley received an ordinary (superannuation) pension.[3]

Curley's union filed a charge, and the Labor Relations Commission has found, that the fire chief violated G. L. c. 150E, § 10(*a*)(1) and (5), by filing the application for Curley's retirement unilaterally, without engaging first in collective bargaining with the union, and without waiting for a final decision by CRAB on Curley's second appeal from the denial of an accidental disability pension. This conclusion was erroneous, the city argues, because the chief's authority to apply for retirement of a firefighter under G. L. c. 32, § 16(1)(*a*), is a matter of exclusive managerial prerogative and thus an impermissible subject for collective bargaining.

Recognition in the public sector of areas of management prerogative reserved from the collective bargaining process began with *School Comm. of Hanover* v. *Curry*, 369 Mass. 683, 684-685 (1976), *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 690 (1976), and *Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Assn.*, 375 Mass. 522, 525-527 (1978), and has been applied in numerous cases, including, most recently, *Massachusetts Coalition of Police, Local 165* v. *Northborough*, 416 Mass. 252, 254-257 (1993), *Higher Educ. Coordinating Council* v. *Massachusetts Teachers' Assn.*, 423 Mass. 23, 27-31 (1996), *School Comm. of Natick* v. *Education Assn. of Natick*, 423 Mass. 34, 40-41 (1996), and *Boston* v. *Boston Police Patrolmen's Assn., Inc.*, 41 Mass. App. Ct. 269, 271-272 (1996). The Labor Relations Commission rejected the city's contention that the fire chief's authority under § 16(1)(*a*) was a matter of exclusive managerial prerogative and was therefore exempt from collective bargaining.

It was agreed that the collective bargaining agreement here was silent on the subject of retirements and specified no

[3]Curley's accidental disability pension related back to January 10, 1989, the date Curley was retired for superannuation, and we assume that he has been paid the difference between his accidental disability pension and the superannuation pension he had been receiving prior to the CRAB decision. Thus, his financial loss as a result of the chief's decision was the difference for that period between a fireman's full pay (under § 111F) and what he has now been paid under his accidental disability pension. The record indicates that the difference in Curley's case was between seventy-two percent of full pay under accidental disability retirement and full pay under § 111F. Ordinary (i.e., superannuation) retirement, according to the evidence, paid Curley sixty-five percent of full pay.

procedural formalities that the fire chief ignored. The commis-
sion concluded, however, that the involuntary superannuation
retirement of Curley had an impact on his compensation, a
subject within the scope of G. L. c. 150E, § 6, and was thus a
mandatory subject of collective bargaining. Moreover, reasoned
the commission, no chief had ever previously filed an involun-
tary superannuation retirement application for a firefighter who
had his own voluntary application pending for accidental dis-
ability retirement; thus, the chief had unilaterally changed an
existing practice that bore on a mandatory subject of bargain-
ing, in violation of G. L. c. 150E, § 10(*a*)(1) and (5). See *School
Comm. of Holbrook* v. *Holbrook Educ. Assn.*, 395 Mass. 651,
653 (1985); *Lee* v. *Labor Relations Commn.*, 21 Mass. App. Ct.
166, 167-169 (1985). Compare, on facts, *Pattison* v. *Labor
Relations Commn.*, 30 Mass. App. Ct. 9, 11, 23 (1991). The city
appealed.

For the purpose of decision we assume, without deciding,
that an involuntary retirement involves terms and conditions of
employment within the meaning of G. L. c. 150E, § 6. Compare
*School Comm. of Braintree* v. *Raymond*, 369 Mass. at 690 ("the
abolition of an employee's position, his transfer to a lesser posi-
tion, and reduction of his salary involved his 'wages, hours and
other conditions of employment' within the meaning of G. L.
c. 149, § 178I," the predecessor to § 6); *School Comm. of
Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 563 (1983)
("the question of termination of employment by layoff is one of
the 'terms and conditions of employment' . . . [, involving] the
very essence of the relationship, the employment itself, and not
a peripheral matter"). Without more, it does not follow that the
city was required to bargain collectively with the union before
its fire chief could apply for the retirement of Curley. "[The]
mere characterization of a feature of a collective bargain or an
arbitration award as 'compensation,' or 'terms or conditions of
employment' or some other subject conventionally or by law
within the scope of either process, will not save the provision if
in substance it defeats a declared legislative purpose." *Water-
town Firefighters, Local 1347* v. *Watertown*, 376 Mass. 706,
714 (1978). Indeed, it taxes the mind to think of some point of
difference that might arise between a public manager and the
employees in his or her unit that could not be said to
bear a relation to terms and conditions of employment.

It has been said that "[a]ny attempt to define with precision and certainty the subjects about which bargaining is mandated by [c.] 150E is doomed to failure." Greenbaum, The Scope of Mandatory Bargaining Under Massachusetts Public Sector Labor Relations Law, 72 Mass. L. Rev. 102 (1987). While uncertainties are inevitable in an area where the lines have been drawn "on a case by case basis," *Burlington* v. *Labor Relations Commn.*, 390 Mass. 157, 164 (1983), the framework for analysis has emerged with workable clarity over time.

The reported decisions seem to cluster broadly into three categories, depending on the type of authorizing statute or other law under which the public manager purports to act. We differentiate three categories: (1) specific authorizing laws and regulations that are listed in G. L. c. 150E, § 7(*d*), including all "municipal personnel ordinance[s], by-law[s], rule[s] or regulation[s]"; (2) general authorizing statutes; and (3) specific authorizing statutes not included in § 7(*d*).

1. The most straightforward, or predictable, category is that in which the public sector employer acts under the authority of a statute, by-law, or regulation listed in § 7(*d*). Here, the employer's freedom of action is always subject to collective bargaining in relation to the mandatory subjects listed in § 6, including wages and terms and conditions of employment. *Labor Relations Commn.* v. *Natick*, 369 Mass. 431, 437-438 (1976). *Commonwealth* v. *Labor Relations Commn.*, 404 Mass. 124, 127 (1989). *Lee* v. *Labor Relations Commn.*, 21 Mass. App. Ct. at 167-168. In this category, a unilateral change in past practice, if it bears on terms and conditions of employment, violates the duty under §§ 6 and 10(*a*)(5) to bargain such changes collectively with the employee's representative. *Id.* at 167.

2. Where the public sector employer is operating under the authority of statutes that define in broad, general terms the employer's management powers, the scope of exclusive management powers has been worked out "on a case by case basis," *School Comm. of Burlington* v. *Labor Relations Commn.*, 390 Mass. at 164, with results not always easy to reconcile. Against the general, long-recognized principle that a discretionary power committed to a public officer by statute may not be delegated to another (see *Brown* v. *Newburyport*, 209 Mass. 259, 266 [1911]; *Morris* v. *Commonwealth*, 412 Mass. 861, 865 [1992]), G. L. c. 150E, §§ 6 and 8, require the public sector employer to bargain with the employee representative on questions relating

to "wages, hours, standards of productivity and performance, and any other terms and conditions of employment," and to submit to grievance and binding arbitration procedures to resolve disputes concerning the interpretation or application of such agreements. As we have said, the words "terms and conditions of employment" are capable of a construction so broad as to encompass almost any matter arising between the public sector employer and the employees.[4]

Thus, in the broad category of cases, comprising the majority of our reported appellate decisions — where the public employer is operating under the authority of general management powers — the inquiry has been directed towards defining the boundary between subjects that by statute, by tradition, or by common sense must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process. Several rules of analysis have been recognized; the most important, having its origin in *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 372 Mass. 605, 614 (1977), is, as later stated in *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. 65, 71 (1979), "whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect." "Such substantive policy decisions are not to be dealt with by arbitration." *Saugus* v. *Newbury*, 15 Mass. App. Ct. 611, 615 (1983). The test in this range of cases calls for a determination whether collective bargaining and arbitration would "defeat[] a declared legislative purpose." *Watertown Firefighters, Local 1347* v. *Watertown*, 376 Mass. at 714. Precluded from collective bargaining under this or similar analysis have been such broad categories as appropriation decisions (committed exclusively to the

---

[4]Few reported cases seem to turn on a determination that the disputed action of a public employer did not involve a term or condition of employment. Cf., however, *West Bridgewater Police Assn.* v. *Labor Relations Commn.*, 18 Mass. App. Ct. 550 (1984), upholding a decision by the commission to the effect that scheduled overtime is a term or condition of employment but that unscheduled, nonmandatory overtime is neither (with the result that the police chief could unilaterally eliminate voluntary police attendance at arraignments, payable as overtime, for budgetary reasons).

pertinent legislative body)[5]; decisions to appoint principals and teachers in public schools (committed to school committees)[6]; decisions to confer tenure on public school teachers[7]; decisions to abolish positions[8]; decisions to reduce budget outlays, even when these decisions will result in reductions in force[9]; and decisions concerning deployment, uniforms, and weapons of police officers.[10]

A second principle that has been applied in this category of cases is that, while an underlying decision may be reserved to the exclusive prerogative of the public employer under the public policy test, the public employer may be required to arbitrate with respect to ancillary matters, such as procedures that the employer has agreed to follow prior to making the decision[11]; or, if the exclusive prerogative decision may be implemented in various ways, some touching on terms and

---

[5]See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 214 (1982); *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 395 Mass. 232, 236-237 (1985); *Billerica* v. *International Assn. of Firefighters, Local 1495*, 415 Mass. 692, 695-696 (1993); *County of Suffolk* v. *Labor Relations Commn.*, 15 Mass. App. Ct. 127, 131-133 (1983); *Saugus* v. *Newbury*, 15 Mass. App. Ct. at 614-615.

[6]*Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Assn.*, 375 Mass. at 523. *School Comm. of Holbrook* v. *Holbrook Educ. Assn.*, 395 Mass. at 656. *School Comm. of Peabody* v. *International Union of Elec., Radio, & Mach. Wrkrs., Local 294*, 19 Mass. App. Ct. 449, 452-454 (1985).

[7]*School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 111-113 (1977); *Dennis-Yarmouth Regional Sch. Comm.* v. *Dennis Teachers Assn.*, 372 Mass. 116, 117 (1977); *School Comm. of W. Bridgewater* v. *West Bridgewater Teachers' Assn.*, 372 Mass. 121, 122 (1977).

[8]*School Comm. of Hanover* v. *Curry*, 369 Mass. at 684-685; *School Comm. of Braintree* v. *Raymond*, 369 Mass. at 690 (also holding, however, that if the collective bargaining agreement provides for compensation to the affected teacher, such a provision may be enforced by an arbitrator); *Higher Educ. Coordinating Council* v. *Massachusetts Teachers' Assn.*, 423 Mass. at 32.

[9]*School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. at 563. *School Comm. of Lynnfield* v. *Trachtman*, 11 Mass. App. Ct. 524, 527-529, S.C., 384 Mass. 813 (1981).

[10]*Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. 680, 684-685 (1989); *Boston* v. *Boston Police Patrolmen's Assn.*, 8 Mass. App. Ct. 220, 225-227 (1979); *Boston* v. *Boston Police Superior Officers Fedn.*, 9 Mass. App. Ct. 898 (1980); *Taunton* v. *Taunton Branch of the Mass. Police Assn.*, 10 Mass. App. Ct. 237, 242-245 (1980); *Boston* v. *Boston Police Superior Officers Fedn.*, 29 Mass. App. Ct. 907, 908-909 (1990); *Boston* v. *Boston Police Patrolmen's Assn.*, 41 Mass. App. Ct. at 272.

[11]In the "procedures" category are those cases in which a school committee has agreed to follow certain procedures in evaluating a teacher's qualification

conditions of employment, the public employer may be required to bargain about the impact of such decisions with the employee representative.[12]

A third principle that has sometimes been applied in this category is that, even where the decision in question lies within the exclusive managerial prerogative of the governmental employer, a collective bargaining agreement may provide for, and an arbitrator may order, compensation to employees affected by the decision.[13]

3. The last category of cases comprises those — relatively few in number — in which the governmental employer acts not under a statute or law listed in § 7(d) or under general management powers but instead under the authority of a statute or law authorizing the employer to perform a specific, narrow function or, alternatively, acts with reference to a statute specific in purpose that would be undermined if the employer's freedom of action were compromised by the collective bargaining process or by arbitration. Within this range of cases, the operative rule seems to be that set out in *Watertown Firefighters, Local 1347* v. *Watertown*, 376 Mass. at 714, quoted above: that the characterization of the subject matter as "compensation" or "terms or conditions of employment" will not require submis-

---

for tenure and then neglects to follow the agreed-upon procedures. See *School Comm. of Danvers* v. *Tyman*, 372 Mass. at 113-115; *Dennis-Yarmouth Regional Sch. Comm.* v. *Dennis Teachers Assn.*, 372 Mass. at 117, 120; *School Comm. of W. Bridgewater* v. *West Bridgewater Teachers' Assn.*, 372 Mass. at 124-127; *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 795-796 (1977); *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. at 73; *School Comm. of New Bedford* v. *New Bedford Educators Assn.*, 9 Mass. App. Ct. 793, 797-799 (1980).

[12]The leading case is *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. at 563-567, in which a decision by a school committee to reduce the size of its janitorial staff was held to be within the school committee's exclusive prerogative, but subsidiary questions, such as whether to achieve the reduction by attrition, shorter hours, or layoffs, and, if the latter, whether the layoffs were to be determined by seniority, by merit, or by some other method, were held to be mandatory subjects of bargaining. In the same category is *Burlington* v. *Labor Relations Commn.*, 390 Mass. at 165-166. See also *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. at 213; *School Comm. of Holbrook* v. *Holbrook Educ. Assn.*, 395 Mass. at 655; *Boston* v. *Boston Police Patrolmen's Assn.*, 403 Mass. at 685.

[13]See *School Comm. of Braintree* v. *Raymond*, 369 Mass. at 691; *School Comm. of Lynnfield* v. *Trachtman*, 11 Mass. App. Ct. at 529-530; *School Comm. of Holbrook* v. *Holbrook Educ. Assn.*, 395 Mass. at 657; *Higher Educ. Coordinating Council* v. *Massachusetts Teachers' Assn.*, 423 Mass. at 33.

sion of the matter to the bargaining or arbitration processes if to do so "will defeat[] a declared legislative purpose."

The recent decision of *School Comm. of Natick* v. *Education Assn. of Natick*, 423 Mass. 34 (1996), is an example. The dispute concerned the refusal of the superintendent to reappoint a high school teacher as head baseball coach, a decision that had a damaging effect on his compensation and was alleged to be in violation of a provision of the collective bargaining agreement forbidding the nonrenewal of a teacher without just cause. The dispute was held to be nonarbitrable: G. L. c. 71, § 47A, limits tenure of public school athletic coaches to three years, and application of the collectively-bargained just cause provision to a renewal decision was incompatible with the statute. *Id.* at 39. It was held to be immaterial "that the subject matter of § 47A is not a core concern of 'educational policy,' " *ibid.*, or that the nonrenewal decision had an impact on the teacher's compensation — normally a subject of mandatory bargaining under § 6. To the same effect, see *Massachusetts Coalition of Police, Local 165* v. *Northborough*, 416 Mass. at 255-256 (refusal to renew the appointment of an officer serving a five-year term under St. 1981, c. 316 — permitting appointments in excess of the three-year term provided by G. L. c. 41, § 97A — was held not to present an arbitrable dispute; "no lawful relief could conceivably be awarded by an arbitrator in this case," *id.* at 256, without conflicting with the inherent "mandate [of] § 97A that police officers are to be appointed for fixed terms," *id.* at 255); *Selectmen of Ayer* v. *Sullivan*, 29 Mass. App. Ct. 931 (1990) (selectmen's decision not to renew the contract of an officer serving pursuant to G. L. c. 41, § 96, for a one-year period, subject to annual renewal, was not subject to arbitration, despite the fact that the decision not to renew was made in the context of a disciplinary proceeding). See also *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Authy.*, 392 Mass. 407, 411-416 (1984); *Massachusetts Bay Transp. Authy.* v. *Local 589, Amalgamated Transit Union*, 406 Mass. 36, 39-41 (1989) (MBTA could not by collective bargaining agreement confine its authority to make appointments according to its sole discretion without violating G. L. c. 161A, § 19; hence, an arbitrator's award was deemed invalid that found the MBTA violated the collective bargaining agreement when it made appointments other than by strict seniority).

The distinction between the group of cases just discussed and those discussed in part 2 has been identified as the explicitness of the statutory authorization under which the governmental employer acts. In *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Authy.*, 392 Mass. at 417, the court distinguished a group of school-related cases by saying: "[There] we were reviewing a school committee's inherent management prerogative under a different statute. At issue was the extent to which a statute providing that the school committee 'shall have general charge of all public schools,' restricts the school committee's ability to bargain away its control over the size of the teaching staff. . . . General Laws c. 161A, § 19, defines explicitly the matters of inherent management right with respect to which the MBTA may not bind itself; such explicit statutory restrictions were not present in the teachers' cases." (Citation omitted.)

In the range of cases where the governmental employer acts pursuant to broad, general management powers, the danger is presented, as pointed out in *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. at 564-566, that to recognize the statutory authority as exclusive would substantially undermine the purpose of G. L. c. 150E, § 6, to provide for meaningful collective bargaining as a general rule with respect to compensation and other terms and conditions of employment. That danger simply is not present when the governmental employer acts pursuant to a specific, narrow statutory mandate.

In this case Lynn's fire chief was acting pursuant to just such a specific, narrow statutory mandate. General Laws c. 32, § 16(1)(*a*) — a statute not listed in c. 150E, § 7(*d*) — gives to any department head "who is of the opinion that any member employed therein should be retired for superannuation, ordinary disability or accidental disability" the authority to file with the retirement board an application for the employee's retirement together with a summary of the reasons for his opinion. The employee is given a right to a hearing before the local retirement board, and ultimately to CRAB. See note 2, *supra*. This subject is controlled in detail by the retirement statutes, under which the action of the chief did nothing to prejudice Curley's own pending application for accidental disability retirement. See *State Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 12 Mass. App. Ct. 306, 306-309 (1981). There was no dispute that, at the time the fire chief applied for the superannuation retirement, Curley was permanently disabled from work-

ing as a firefighter. Compare *MacDonald* v. *Commissioner of the Metropolitan Dist. Commn.*, 33 Mass. App. Ct. at 460-461. Nevertheless, Curley had, for five years, occupied at full pay one of the firefighter positions upon which the chief had to depend to field crews to fight fires.

The Labor Relations Commission conceded in its decision that the action of the chief violated no provision of the collective bargaining agreement. Its analysis turned on two propositions: that retirement would have an impact on Curley's compensation, and thus was a mandatory subject of collective bargaining, and that the fire chief had departed from past practice. As to the "impact" conclusion, we are, for the reasons stated above, in doubt as to the relevance of the impact decisions in the range of cases where the employer's authority derives from a specific, narrow statute vesting discretion as to a particular decision in specified public officers. Apart from that, two distinctions must be taken. First, the loss of compensation would not result directly from the fire chief's filing of the application for the involuntary retirement but, rather, from the decision of the retirement board and CRAB that retirement was called for in the circumstances. See *Jones* v. *Wayland*, 374 Mass. 249, 260 (1978); *Hennessey* v. *Bridgewater*, 388 Mass. 219, 226 (1983). Second, the financial impact of the retirement was spelled out with specificity in the retirement statutes and is thus beyond the scope of negotiation. There is no obligation to engage in collective bargaining as to matters controlled entirely by statute. *Commonwealth* v. *Labor Relations Commn.*, 404 Mass. 124, 126 (1989). *National Assn. of Govt. Employees, Local R1-162* v. *Labor Relations Commn.*, 17 Mass. App. Ct. 542, 544 (1984).

As to the finding that the fire chief departed from past practice, the finding is, in our view, not supported by the evidence before the commission. The evidence showed that the fire chief had on several occasions filed involuntary applications for accidental disability retirement and that, in two instances, he had been persuaded to refrain from filing applications for superannuation retirement in order that the firefighter involved might file his own voluntary application for accidental disability retirement. Here, however, Curley's own application for accidental disability retirement had been pending for several years, had just been rejected a second time by the Lynn retirement board, and was expected to be two more years in process before

final decision by CRAB. There was no showing in the evidence that any fire chief had been confronted previously with so extended an absence of a firefighter who had filed a voluntary application. As the fire chief had not previously been confronted with a comparable situation, there was no basis for finding that there was a practice that he would not act in such a situation. See *Doris* v. *Police Commr. of Boston*, 374 Mass. 443, 449 (1978).[14]

For these reasons we think the commission was in error in concluding that the fire chief's authority to act under G. L. c. 32, § 16(1)(*a*), was subject to mandatory collective bargaining. There was, in effect, nothing to bargain about except whether the chief should exercise the authority conferred in him by the statute. To conclude that that may be the subject of bargaining is, in effect, to negate the purpose of the statute in entrusting the discretion to the fire chief. The fire chief's authority under § 16(1)(*a*) to file an involuntary retirement application is a matter of exclusive managerial prerogative. Compare *Sullivan* v. *Belmont*, 7 Mass. App. Ct. 214, 220 (1979), where it is suggested that a decision to file an involuntary retirement application might be the subject of a prohibited practice charge where it is alleged that the action was taken in retaliation for union activities. Nothing of that sort was alleged in this case.

The decision of the commission is therefore reversed.

*So ordered.*

---

[14]In any event, because category 3 cases are not subject to collective bargaining, past practice would appear to be immaterial.