NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12621

BOARD OF HIGHER EDUCATION  vs.  COMMONWEALTH EMPLOYMENT
RELATIONS BOARD[1] & another.[2]


Suffolk.     February 7, 2019. - October 7, 2019.

Present:  Gants, C.J., Lenk, Lowy, Budd, Cypher, & Kafker, JJ.


Commonwealth Employment Relations Board.  Education, Public
    colleges and universities.  Public Employment, Collective
    bargaining.  Labor, Public Employment, Collective
    bargaining.



Appeal from a decision of the Commonwealth Employment
Relations Board.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


James B. Cox, Special Assistant Attorney General, for the
employer.
T. Jane Gabriel for Commonwealth Employment Relations
Board.
Laurie R. Houle for the intervener.

---

[1] The Commonwealth Employment Relations Board (board) is the
successor to the Labor Relations Commission.  See St. 2007,
c. 145, §§ 5, 7, and 8.

[2] Massachusetts State College Association, intervener.

BUDD, J.  We have long recognized the tension between the statutory right of public employees to bargain collectively the terms and conditions of their employment with public employers and the Legislature's intent to bestow upon those employers nondelegable managerial responsibilities.  The relationship between the faculties and the boards of trustees at our State colleges[3] is no exception.  See, e.g., Higher Educ. Coordinating Council/Roxbury Community College v. Massachusetts Teachers' Ass'n/Mass. Community College Council, 423 Mass. 23, 28 (1996) (Roxbury Community College).  Here, the Board of Higher Education (BHE) has appealed from a decision of the Commonwealth Employment Relations Board (board), upholding a provision in a collective bargaining agreement between the BHE and the Massachusetts State College Association[4] (union) that placed a cap on the percentage of courses taught by part-time faculty at the Commonwealth's State colleges.  The BHE argues that, although it bargained for this provision, it is not enforceable because it impermissibly intrudes on the nondelegable managerial prerogatives of the State college boards of trustees and, as

---

[3] By St. 2010, c. 189, § 12, the Legislature conferred university status on the State colleges, and some of the colleges changed their names accordingly.  However, as the parties refer to the institutions as colleges, we do likewise.

[4] The Massachusetts State College Association is affiliated with the Massachusetts Teachers Association and the National Education Association.

such, is not a proper subject of collective bargaining. We disagree and therefore affirm the board's decision.

1. Background. a. Public sector collective bargaining. Enacted in 1973, G. L. c. 150E provides a comprehensive framework for the regulation of public sector collective bargaining. Labor Relations Comm'n v. Boston Teachers Union, Local 66, 374 Mass. 79, 93 (1977). See Greenbaum, The Scope of Mandatory Bargaining under Massachusetts Public Sector Labor Law, 72 Mass. L. Rev. 102, 102 (1987). The statute recognizes important collective bargaining rights for public employees and imposes significant obligations on public employers with respect to those rights. In particular, G. L. c. 150E, § 2, provides: "Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, and other terms and conditions of employment, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion." Public employers are obligated to "negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment." G. L. c. 150E, § 6. The statute also sets forth

practices in which public employers and employees may not engage.[5]  See G. L. c. 150E, § 10.

Finally, the statute provides for the resolution of disputes that may arise during the collective bargaining process, or after the agreement has been finalized, during the pendency of the agreement.  Should the parties fail to come to terms as to any mandatory subject of bargaining, G. L. c. 150E, § 9, prescribes procedures to determine whether an impasse exists and how to resolve it.  And G. L. c. 150E, § 11, sets forth a comprehensive process by which either side may bring a complaint regarding a practice prohibited by G. L. c. 150E, § 10.

b.  State college system.  Each of the Commonwealth's State colleges[6] is governed by its own board of trustees which "appoint[s], transfer[s], dismiss[es], promote[s] and award[s]

---

[5] Prohibited practices by employers under G. L. c. 150E, § 10, include, inter alia, the refusal of the employer to bargain in good faith with the exclusive representative of the employee organization over mandatory subjects of bargaining, G. L. c. 150E, § 10 (a) (5); interference with any employee's exercise of his or her collective bargaining rights, G. L. c. 150E, § 10 (a) (1); and discrimination against an employee due to union membership, G. L. c. 150E, § 10 (a) (3).

[6] The Commonwealth's State colleges are Bridgewater State College, Fitchburg State College, Framingham State College, the Massachusetts College of Art and Design (Mass. Art), the Massachusetts Maritime Academy, the Massachusetts College of Liberal Arts, Salem State College, Westfield State College, and Worcester State College.  See note 3, supra.

tenure to all personnel of [its respective] institution." G. L.
c. 15A, § 22. The BHE, which is "responsible for defining the
mission of and coordinating the [S]tate's system of higher
education," "work[s] with [the State college] boards of trustees
to identify and define institutional missions . . . as well as
to define each institution's role within the greater system."
G. L. c. 15A, § 1. Although each board of trustees is
responsible for appointing faculty at its respective college, it
is the BHE that is the statutory employer of State college
faculty members under G. L. c. 150E, and the party to the
collective bargaining agreement.[7] Correspondingly, the union is
the exclusive bargaining representative for certain faculty
members employed by the BHE, as identified in the parties'
collective bargaining agreement.

Students at State colleges are taught by both full-time and
part-time faculty. Full-time faculty members may be tenured,
tenure-track, or temporary.[8] Full-time faculty members generally

---

[7] The parties' collective bargaining agreement provides that
"[a]ctions to be taken by any [board of trustees] . . . are
rights and obligations created or imposed by the terms of this
[a]greement and as such are binding upon the [Board of Higher
Education (BHE)] as the employer under G. L. c.] 150E."

[8] Full-time temporary faculty members teach from one to four
consecutive semesters, advise students who are assigned to them,
and have the same workload as tenured or tenure-track faculty
members.

teach a full course load each semester[9] and receive an annual salary with benefits.  Tenured and tenure-track faculty members also participate in governance at their respective colleges, including structuring academic programs, designing curricula, and serving on departmental committees.  In addition, some full-time faculty serve as department chairs, who are responsible for supervising and evaluating other full-time and part-time faculty members in their respective departments.

Part-time or adjunct faculty generally do not receive employee benefits.[10]  Part-time faculty are also not eligible to become members of the bargaining unit until they complete three consecutive semesters, and they cannot be hired for more than four consecutive semesters.  The colleges hire part-time faculty when the number of courses needed exceeds the ability of full-

---

[9] By the terms of the agreement, a full-time faculty member may fulfill his or her professional responsibilities by alternative means or may have his or her workload reduced in some circumstances.  Full-time faculty who have served at the State colleges for a sufficient length of time may also take sabbatical leave.

[10] Mass. Art alone employs some faculty members on a "benefited" part-time basis.  Unlike regular part-time positions, benefited part-time faculty possess the same rights, benefits, and responsibilities as full-time faculty members.  Moreover, benefited part-time faculty at Mass. Art are included in the bargaining unit defined in the parties' agreement.  For ease of reference, we include these benefited part-time faculty members in the term "full-time faculty."

time faculty to deliver those courses,[11] or when teachers with specialization in a particular area are needed.[12]  It costs the colleges less to hire a part-time adjunct than a full-time faculty member because part-time adjuncts are paid per course rather than per semester or on a yearly salary.  Because the decision to grant tenure involves a major financial commitment on the part of the college, the fact that adjuncts are not eligible for tenure also makes them less expensive to hire.

The decision to hire adjunct faculty is made by individual colleges each academic year based on the number of students enrolled in particular programs and related courses.  The colleges balance the need to offer lower level core courses against the availability of full-time instructors to teach those courses.  The colleges must also respond to changing conditions such as increases in student enrollment.  For example, as the board found, enrollment numbers for first-year students at some State colleges in academic year 2007-2008 were higher than expected, and the colleges did not have enough full-time faculty

---

[11] The State colleges require all students to enroll in designated core curriculum courses as a prerequisite to earning their degrees.  The preference is to have part-time faculty teach the core curriculum courses.

[12] The BHE states that State colleges employ part-time faculty to teach subjects such as art, music, theater, and certain foreign languages and to bring practical expertise in particular disciplines into the classroom.

members to teach all the core courses.  The colleges addressed this by hiring additional part-time instructors to teach those courses.

c.  Article XX, § C(10) of the collective bargaining agreement.  The BHE and the union were parties to a collective bargaining agreement for the period between July 1, 2004, and June 30, 2007 (agreement).  Pursuant to a further memorandum of agreement dated August 27, 2007, the agreement was in effect in late 2007, when the dispute arose over the enforceability of a provision therein.  That provision, Article XX, § C(10) (§ C[10]), provides:

"Part-Time Appointments:  Limitations

"This subsection shall be of application only to departments with six (6) or more full-time members.

"Except at [Massachusetts College of Art and Design (Mass. Art)], not more than fifteen percent (15%) of an academic department's total number of three (3) credit courses and sections shall be taught by part-time employees during an academic year.

"At [Mass. Art], not more than twenty percent (20%) of the total number of three (3) credit courses taught in a department with six (6) or more full-time faculty shall be taught by part-time employees during an academic year.

"Not included in the foregoing are courses or sections taught by part-time employees hired to replace unit members on sabbatical leave of absence, on unpaid leave of absence, on reduced teaching loads for the purpose of alternative professional responsibilities or [union] release time, or any other contractual released time, or any unforeseen emergency."

The language in § C(10) first appeared in the parties' 1986-1989 contract and remained in effect through the 2004-2007 agreement.

As the board found, the purpose of capping the hiring of part-time faculty traditionally has been to help ensure a manageable workload for full-time faculty members. An increase in the number of part-time faculty members results in an increased workload for department chairs who must hire, supervise, and evaluate the part-time faculty. It also increases the workload for full-time faculty members generally because it reduces the pool of full-time faculty available to staff committees. An increased workload for full-time faculty members reduces their ability to pursue scholarship (e.g., research, publishing, and presentation at conferences) in their chosen fields of study. It also reduces their ability to meet and work one-on-one outside the classroom with their students.

The caps on the percentage of part-time faculty contained in § C(10) do not leave the colleges without flexibility in hiring. As the board found, before the start of an academic year, the parties know the core courses offered; the number of full-time tenured, tenure-track, and temporary faculty; and the number of students enrolled for the fall semester. This information makes it possible for the colleges to avoid violating § C(10) in a number of ways. The colleges can (1) hire more full-time faculty members; (2) where permissible

under the agreement, direct full-time faculty to teach more courses, including lower-level core courses; (3) cancel courses; (4) reduce course offerings; (5) combine low-enrollment courses; (6) increase student enrollment caps for courses; (7) use historic data to plan courses more carefully; and (8) control matriculation.

Moreover, when there is a shortage of faculty due to exigent circumstances such as retirement, medical leave of absence, sabbatical, death, or increase in student enrollment, § C(10) does not limit the colleges' ability to hire faculty members on a full-time temporary (semester-by-semester) or part-time temporary (course-by-course) basis.  The colleges also may respond by arranging tenured and tenure-track faculty to assume more courses than required by the agreement or by shifting full-time faculty members from compliant to noncompliant departments.[13]

d.  <u>Violations of part-time faculty hiring caps</u>.  For seven years, from academic year 2001-2002 through academic year 2007-2008, nearly all of the State colleges reported having academic

---

[13] The parties explain that this does not mean transferring a professor from one department to another, but rather increasing the number of full-time faculty positions in some departments and decreasing the number of such positions in others.

departments in violation of the part-time faculty hiring caps.[14]
The total number of departments that violated the caps rose from
fourteen in academic year 2001-2002 to thirty-one in academic
year 2007-2008.  The total number of course sections that
violated those caps rose from 416 in academic year 2004-2005 to
664 in academic year 2007-2008.  Specifically, in academic year
2005-2006, five colleges had twenty departments and 346 course
sections taught by part-time faculty members that exceeded the
fifteen percent cap.[15]  In academic year 2006-2007, seven
colleges reported having twenty-seven departments and 551 course
sections in violation of the caps.  In academic year 2007-2008,
eight colleges had thirty-one departments and 663 course
sections in excess of the caps.

     e.  Prior proceedings.  By a memorandum dated March 7,
2002, the union filed a consolidated grievance with the chair of
the Council of State College Presidents (council),[16] alleging
that the BHE had violated the part-time hiring cap by exceeding

---

[14] The one college in compliance was Fitchburg State
College.

[15] Mass. Art reported zero violations for academic year
2005-2006.

[16] The Council of State College Presidents (council) is the
body by which the presidents of the nine State colleges act upon
matters of mutual concern, notably collective bargaining.  Under
the terms of the agreement, the BHE acts through the council or
its chair in matters arising thereunder, including grievances.

the maximum number of part-time faculty in each academic department.[17]  By letter dated February 23, 2006, the chair of the council notified the union president of her decision on the grievance, finding that the BHE violated § C(10) by excessive reliance on part-time faculty.  Her decision stated in part:

> "I find no reason to question the sufficiency of the factual basis for the [union]'s claim.  I conclude from it that seven of the Colleges -- Fitchburg [State College] and [Massachusetts] Maritime Academy are . . . exceptions -- have at different points (though not at every point in every case) violated the Agreement by employing, in various departments at various times, more part-time faculty to teach three-credit courses than the Agreement permits."

The chair went on to direct the colleges to reduce their reliance on part-time faculty starting in academic year 2006-2007 and to be in compliance with § C(10) no later than the end of academic year 2008-2009.

The parties commenced successor contract negotiations in 2007.  During that summer, the BHE proposed to delete § C(10).  The union rejected that proposal, and the BHE withdrew it.  Also in the summer of 2007, the union discovered that some colleges had failed to reduce their reliance on part-time faculty for academic year 2006-2007 and had, in fact, increased the number of part-time faculty members who were hired in excess of the

---

[17] At least one State college, Salem State College, acknowledged that several of its departments were in violation of the fifteen percent cap.

fifteen and twenty percent caps and in contravention of the 2006 grievance decision.

Although the parties finalized the successor agreement on August 27, 2007, which also included a part-time faculty hiring cap, the BHE, through its counsel, took the position that this provision "intrudes upon and impairs an authority that the laws of this Commonwealth vest exclusively in the persons charged with managing the State Colleges . . . in other words, [it is a matter] of managerial prerogative" and that the provision is "unlawful," "unenforceable as a matter of law," and "a legal and contractual nullity."  However, the president of Fitchburg State College assured the union on behalf of the council:

> "Speaking for all of the Colleges, we wish you to know that we intend, in fact, to adhere to the provisions of the new collective bargaining agreement now at issue.  With respect to the use of part-time faculty, therefore, the Colleges will continue to implement the grievance decision . . . rendered on February 23, 2006."

Despite this assurance, certain departments at Bridgewater State College, Framingham State College, Salem State College, and Westfield State College, as well as Mass. Art, still violated the fifteen and twenty percent caps for academic year 2007-2008 by excessive reliance on part-time faculty members.

On May 30, 2008, pursuant to G. L. c. 150E, § 11, the union filed a charge of prohibited practice with the Division of Labor Relations (division), alleging that the BHE violated its duty to

bargain in good faith under G. L. c. 150E, § 6, by repudiating § C(10) of the agreement as well as the 2006 grievance decision. The division investigated the charge and, on May 6, 2009, issued a complaint of prohibited practice. Over several days in 2010 and 2011, a hearing proceeded before a hearing officer, who issued a decision on January 16, 2014, finding that the BHE had repudiated both § C(10) and the 2006 grievance decision. The BHE appealed to the board, which affirmed the hearing officer's decision in its entirety.[18] The BHE appealed to the Appeals Court, see G. L. c. 150E, § 11 (i), and we transferred the case to this court on our own motion.

2. Discussion. We review the board's decision pursuant to G. L. c. 30A, § 14 (7), under which a final administrative agency decision will be upheld unless, "among other grounds, it is '[u]nsupported by substantial evidence,' G. L. c. 30A, § 14 (7) (e), or '[a]rbitrary or capricious, an abuse of discretion or otherwise not in accordance with law, G. L. c. 30A, § 14 (7) (g)."[19] Commissioner of Admin. & Fin. v. Commonwealth Employment

---

[18] In doing so, the board accepted the hearing officer's findings of fact, with minor modifications.

[19] Although the BHE claims that the board disregarded certain evidence and disputes particular inferences drawn by the board from the evidence, the BHE has not shown that any of the findings were unsupported by substantial evidence. See Duggan v. Board of Registration in Nursing, 456 Mass. 666, 674 (2010), citing School Comm. of Brookline v. Bureau of Special Educ. Appeals, 389 Mass. 705, 716 (1983) ("the reviewing court must

Relations Bd., 477 Mass. 92, 95 (2017), citing G. L. c. 150E, § 11 (i). We "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as the discretionary authority conferred upon it." G. L. c. 30A, § 14. Here, the BHE grounds its argument in the nondelegability doctrine, insisting that § C(10) is unenforceable because the provision impermissibly intrudes on the BHE's managerial authority, see, e.g., Billerica v. International Ass'n of Firefighters, Local 1495, 415 Mass. 692, 694 (1993), and that the board erred in failing so to conclude.[20]

The BHE contends that § C(10) infringes on the nondelegable power that the statute at issue here, G. L. c. 15A, § 22, confers upon the State college boards of trustees to "appoint, transfer, dismiss, promote and award tenure to all personnel," and, more generally, the "unfettered authority to make decisions bearing on core issues of educational policy," in an effort to provide the most effective education for students" (quotations omitted). Massachusetts Community College Council v. Massachusetts Bd. of Higher Educ./Roxbury Community College, 81

---

defer to the agency's right to draw inferences from the testimony and evidence before it").

[20] As noted supra, the hearing officer found that the BHE deliberately repudiated § C(10), and the board upheld this finding over the BHE's challenge. The BHE has not pressed that issue before us.

Mass. App. Ct. 554, 560 (2012), S.C., 465 Mass. 791 (2013), quoting Board of Higher Educ. v. Massachusetts Teachers Ass'n, NEA, 62 Mass. App. Ct. 42, 49 (2004).  See G. L. c. 15A, § 22 (c).

However, there is a "strong public policy favoring collective bargaining between public employers and employees over the conditions and terms of employment."  Somerville v. Somerville Mun. Employees Ass'n, 451 Mass. 493, 496 (2008). Thus, "the principle of nondelegability is to be applied only so far as is necessary to preserve the college's discretion to carry out its statutory mandates."  Massachusetts Bd. of Higher Educ./Holyoke Community College v. Massachusetts Teachers Ass'n/Mass. Community College Council/National Educ. Ass'n, 79 Mass. App. Ct. 27, 32 (2011).

The scope of a governmental employer's nondelegable authority depends on "the explicitness of the statutory authorization under which [that] employer acts."  Lynn v. Labor Relations Comm'n, 43 Mass. App. Ct. 172, 182 (1997).  "Where the public sector employer is operating under the authority of statutes that define in broad, general terms the employer's management powers, the scope of exclusive management powers has been worked out 'on a case by case basis.'"  Id. at 177, quoting Burlington v. Labor Relations Comm'n, 390 Mass. 157, 164 (1983).

In such a case, we ask "whether the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect." Lynn, 43 Mass. App. Ct. at 178, quoting School Comm. of Boston v. Boston Teachers Union, Local 66, 378 Mass. 65, 71 (1979).[21] For example, in School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 565-566 (1983), we ruled that statutes conferring "general authority [on a school committee] over the operation and maintenance of public schools," as well as "general grants of authority to discharge employees," must yield to the obligation to engage in collective bargaining over the decision to achieve a reduction in force by means of layoffs and the impact of that decision on employees.

Where, in contrast, the employer acts "under the authority of a statute or law authorizing the employer to perform a specific, narrow function or, alternatively, acts with reference to a statute specific in purpose that would be undermined if the employer's freedom of action were compromised by the collective

_____

[21] Even if a management decision itself is a matter of nondelegable authority, the employer may nonetheless be required to bargain over ancillary matters such as the means of implementing that decision and the impact of the decision on the terms and conditions of employment. School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 563-564 & n.5 (1983), and cases cited. Lynn v. Labor Relations Comm'n, 43 Mass. App. Ct. 172, 179-180 (1997).

bargaining process," we will not enforce a conflicting provision in a collective bargaining agreement. Lynn, 43 Mass. App. Ct. at 180. Instead, the narrowly drawn statute would take precedence.[22] For example, in Local 589, Amalgamated Transit Union v. Massachusetts Bay Transp. Auth., 392 Mass. 407 (1984), the enabling statute of the Massachusetts Bay Transportation Authority (MBTA) was amended so that the MBTA was prohibited from "enter[ing] into collective bargaining agreements with respect to matters of inherent management right," which expressly included the right "to hire part-time employees." Id. at 413 n.2, quoting G. L. c. 161A, § 19, as amended by St. 1980, c. 581, § 8. When certain provisions in an arbitrator's decision dealt with the percentage of part-time employees that the MBTA could hire, and dictated certain terms of their employment, this court determined that the challenged provisions were unenforceable as they improperly intruded on the MBTA's inherent management rights. Id. at 415-416.

---

[22] The exception to this rule is found in G. L. c. 150E, § 7 (d), which enumerates several statutes that would yield to the terms of a collective bargaining agreement if there were a conflict between one of the statutes and the agreement. See Chief Justice for Admin. & Mgt. v. Office & Professional Employees Int'l Union, Local 6, AFL-CIO, 441 Mass. 620, 629 (2004). Although the statute at issue here, G. L. c. 15A, § 22, is not among the statutes enumerated in G. L. c. 150E, § 7 (d), we note that, unlike G. L. c. 15A, § 22, "the statutes . . . in § 7 (d) . . . are specific mandates to do or not to do something in connection with the terms and conditions of employment of public employees." School Comm. of Newton, 388 Mass. at 566.

Similarly, in School Comm. of Natick v. Education Ass'n of Natick, 423 Mass. 34, 37-38 (1996), this court concluded that a provision in a collective bargaining agreement prohibiting the nonrenewal of a teacher's employment without just cause could not be used to require the reappointment of a school athletic coach, because G. L. c. 71, § 47A, specifically limited the tenure of public school athletic coaches to three years.  We reasoned that "[a] collective bargaining agreement which conferred just cause protection, and de facto tenure, on a public high school coach would conflict with the durational limitation of § 47A."  Id. at 39.

In our view, c. 15A, § 22, is a grant of management authority in broad, general terms.  Unlike the statute at issue in Local 589, Amalgamated Transit Union, 392 Mass. at 413 n.2, nothing in the language of § 22 explicitly prohibits the BHE from bargaining over the hiring of part-time faculty.  The statutory authority to "appoint, transfer, dismiss, promote and award tenure" set forth in § 22 places in the realm of nondelegable management authority only the "authority to make 'specific appointment determinations, and decisions to abolish positions.'"  Massachusetts Community College Council, 81 Mass. App. Ct. at 560, quoting Board of Higher Educ. v. Massachusetts Teachers Ass'n, NEA, 62 Mass. App. Ct. 42, 49 (2004).  See Roxbury Community College, 423 Mass. at 32 (decision to abolish

full-time position within exclusive managerial prerogative of college administrators; arbitrator improperly directed college to create full-time position and assign it to specific grievant). See also School Comm. of Natick, 423 Mass. at 39, quoting School Comm. of Holbrook v. Holbrook Educ. Ass'n, 395 Mass. 651, 655 (1985) ("it is by now well-settled that 'specific appointment determinations . . . are within the exclusive managerial prerogative of [employers], and thus beyond the scope of collective bargaining"). Section C(10) of the agreement, which limits only the percentage of courses that may be taught by part-time faculty in certain departments, does not interfere with this authority; that is, it does not in any way dictate, for example, whom to hire or to whom to award tenure.

Nor does § C(10) materially conflict with the BHE's more general authority to set educational policy. In arguing that § C(10) intrudes on this authority, the BHE contends that limiting the number of courses taught by part-time faculty, who are less expensive to employ than full-time faculty, requires the colleges to sacrifice other objectives and inhibits the ability to provide students with a high-quality education in a cost-effective manner. But if we were to hold that these financial considerations rendered § C(10) an intrusion on nondelegable authority, we would be hard-pressed to discern any limiting principle. Any provision or any given collective

bargaining agreement could potentially affect the way an employer allocates funds by, for example, requiring the employer to pay higher wages than it otherwise would have, thus diverting resources away from the employer's other objectives. The collective bargaining agreement at issue does not usurp managerial authority merely by requiring the colleges to balance competing obligations within certain parameters.

To the extent § C(10) touches on nondelegable decisions of educational policy, it is the result of proper collective bargaining over the means to implement that policy. As mentioned in note 21, supra, "the means of implementing . . . a nondelegable decision may properly be the subject of an enforceable collective bargaining agreement." School Comm. of Newton, 388 Mass. at 564. Indeed, as the board observed, § C(10) "only comes into play once the [BHE] determines the number of students it will admit and the number of classes that must be taught in any given college and/or department and after the [BHE] makes a decision whether to hire additional faculty to meet those needs." Only then can it be decided how many full- or part-time faculty must be hired in order to teach the classes, thus implementing the core policy decisions concerning the colleges' curricula.

We conclude that § C(10) of the agreement is valid and enforceable. The parties bargained for it pursuant to the

collective bargaining process, and the BHE is bound to abide by it as long as the agreement remains in force.[23]

    5.  <u>Conclusion</u>.  The decision of the Commonwealth Employment Relations Board is affirmed.

<u>So ordered</u>.

---

[23] We note, as did the board, that the State college presidents reaffirmed their commitment to comply with § C(10). The BHE, of course, remains free to raise its objections to the caps at the bargaining table and to offer the union other concessions, if need be, to raise the limits or remove them altogether.  And if the parties should reach an impasse despite good faith bargaining, there are procedures available to resolve it.  See G. L. c. 150E, § 9.