SHERIFF OF WORCESTER COUNTY *vs*. LABOR RELATIONS
COMMISSION & another.[1]

No. 01-P-1628.

Suffolk. April 10, 2003. - March 18, 2004.

Present: LAURENCE, McHUGH, & COHEN, JJ.

*Sheriff. Correction Officer. Labor Relations Commission. Labor,* Collective
bargaining, Duty to bargain. *Public Employment,* Collective bargaining.
*Limitations, Statute of.*

This court concluded that the statute of limitations did not bar the defendant
labor relations commission from acting on a union's charges that the
plaintiff had failed to bargain with the union before issuing a directive
prohibiting correction officers from wearing pins or other unauthorized ac-
couterments on their uniforms, where substantial evidence supported the
determination of a hearing officer that no policy prohibiting the wearing of
pins or other nonstandard uniform adornments had been in place more than
six months before the union filed its prohibited practice charge. [637-638]
This court concluded that the defendant labor relations commission erred in
ordering the plaintiff to cease and desist from failing to bargain with the
union representing correction officers on the subject of wearing pins on the
officers' uniforms, insofar as the order pertained to badges, pins, and any
nonstandard uniform attire other than pins and badges containing union
insignia, where G. L. c. 126, § 9A, gave the plaintiff the power to
promulgate uniform standards, and this statute was not one of the statutes
that must give way to conflicting terms of a collective bargaining agree-
ment or be included in the collective bargaining process [638-640];
however, with regard to the wearing of union pins, the right to prescribe
uniforms in § 9 did not supersede the officers' right under G. L. c. 150E,
§ 2, to wear union insignia absent a showing of special circumstances,
which did not exist in this case, and therefore, substantial evidence sup-
ported the defendant's conclusion that the plaintiff's directive prohibiting
the wearing of union pins constituted a prohibited practice in violation of
G. L. c. 150E, § 10(*a*)(1) and 10(*a*)(5) [640-644].

APPEAL from a decision of the Labor Relations Commission.

*Marc L. Terry* for the plaintiff.

[1]Massachusetts Corrections Officers Federated Union, intervener.

*Marjorie F. Wittner* for the defendant.

*Joseph S. Fair* for the intervener.

McHugh, J. After the sheriff of Worcester County issued a directive prohibiting his unionized employees from "wearing . . . any pins or other [unauthorized] accouterments" on their uniforms, the Massachusetts Correction Officers Federated Union (union or MCOFU) filed a prohibited practice charge with the Labor Relations Commission (commission) alleging that the directive violated G. L. c. 150E, §§ 10(*a*)(1) and 10(*a*)(5). Following the customary hearing, the commission agreed and issued an order requiring the sheriff, among other things, to bargain with the union before imposing a ban on pins, including union insignia pins, and to refrain from interfering with the employees' rights to wear any pins, including those containing the union's insignia. The sheriff appeals. On the record before us, considered in light of applicable statutes, we believe that the sheriff was required to bargain before banning union pins and insignia but not any other pins or accouterments. We, therefore, affirm in part and reverse in part.

The following unchallenged facts underlie the commission's decision.[2] The Worcester County house of correction[3] (the jail) is the workplace of approximately 350 correction officers who are assigned, in shifts, to watch over 1,200-1,300 inmates, about 167 percent of the number the jail was designed to hold. The inmates either are awaiting trial, often for serious crimes such as murder, rape, and armed robbery, or are serving sentences, generally of two and one-half years or less.

The correction officers, as one might imagine, often deal with serious security situations and with violent behavior. To do so effectively, they are organized according to a hierarchical,

---

[2]The commission designated this case as one in which it would issue a decision in the first instance. See 456 Code Mass. Regs. § 13.02(1) (1993). Compare 456 Code Mass. Regs. § 13.02(3) (1993). A hearing officer produced recommended findings and conclusions, which both parties had the right to challenge before the commission considered them. See 456 Code Mass. Regs. § 13.02(2) (1993). Neither party challenged any of the hearing officer's recommended findings of fact, and the commission adopted them in their entirety.

[3]With the abolition of Worcester County government, see St. 1997, c. 48, the facility's title now simply reflects its geographic location.

paramilitary command structure headed by an elected sheriff and, in descending order, a "deputy superintendent, . . . three first assistant deputy superintendents, several assistant deputy superintendents, captains, lieutenants, sergeants, permanent correction officers, and temporary correction officers."

All permanent correction officers wear a uniform consisting of a standardized shirt, pants, necktie, name plate, gold badge, shirt sleeve patch reading "sheriff's department, [W]orcester [C]ounty," and a pin indicating the officer's rank. Temporary correction officers have the same name plate and shirt patch but wear a different color uniform, have no tie, and wear a silver badge instead of a gold one.

On March 14, 1997, MCOFU was certified as the exclusive bargaining representative for all correction officers and sergeants working at the jail.[4] Shortly thereafter, John Gabriel, the first assistant deputy superintendent, reported to Deputy Superintendent William E. Frisch that he had seen correction officers wearing MCOFU pins on their uniforms and that others had reported similar sightings to him. As a result, on April 18, 1997, an attorney representing the sheriff sent a letter to MCOFU's lawyer stating that it was "against the policy of the Jail" for officers to wear union pins while in uniform. The letter made no mention of other pins.

On April 22, 1997, Frisch underscored the lawyer's April 18 letter in a memorandum he sent to all assistant deputy superintendents. In his memorandum, Frisch said that the sheriff's "dress code" prohibited officers from "wearing . . . any pins or other accouterments, not specifically authorized . . . on the prescribed uniform." Frisch ended with an instruction requiring the deputy superintendents to insure that their command staffs "vigorously enforce this policy."

The April letter and memorandum did not mark the first occasions on which the sheriff, acting through subordinates, had expressed his views on the subject of nonstandard pins and badges. In 1995, about two years earlier, a MCOFU vice-president had written the sheriff to ask whether he had issued an order banning officers from wearing union pins and, if so,

---

[4]Before March 14, the officers and sergeants had been represented by the International Brotherhood of Correctional Officers (IBCO).

whether that order applied to all union pins or only to those of MCOFU, which was then engaged in an organizing campaign. Frisch responded with a letter stating that the existing "dress code" and collective bargaining agreement[5] prohibited officers from wearing "nonregulation clothing or insignia." The letter went on to say that the "dress code" had been in effect since 1987 and applied both to union and to nonunion pins and insignia.

Notwithstanding references to policies and "dress codes" in the writings just described, the commission found that, for at least fourteen years before Frisch's April 22, 1997, memorandum, "correction officers, sergeants, lieutenants, and captains . . . regularly [adorned their uniforms with] a variety of pins, including [MCOFU] and IBCO pins . . . and [wore] a variety of tie clips on their ties."[6] During that fourteen-year period, "no supervisor asked an officer to remove any pin or tie clip, including [u]nion pins." After Frisch sent his April 22 memorandum, however, supervisors did begin asking officers to remove some pins and clips. As a consequence, "correction officers and sergeants stopped wearing [u]nion pins, but continued to wear guardian angel pins and other pins in most areas of the [jail], and in the presence of supervisory correction officers."[7] Ultimately, the commission was unpersuaded by the evidence that any policy or practice prohibited pin wearing before April 22, 1997.

Finally, the commission noted in the course of its findings that one deputy superintendent had opined during his testimony

---

[5]The agreement was with IBCO, see note 4, *supra.* Although the agreement itself is not in the record, the commission found that it described the mandatory uniform but did "not address or identify any items that [were] prohibited from being worn, including pins on uniforms" and, therefore, did not "expressly prohibit[] the wearing of pins."

[6]The dress code Frisch referenced was not offered in evidence at the hearing. Frisch himself did not testify at the hearing and no testimony supporting the existence or content of a dress code was offered. On the contrary, all of the officers who testified at the hearing said that they were unaware of any written or unwritten rule prohibiting pins. They also said that they had worn pins without reproach and had seen all levels of officers below the rank of deputy superintendent do likewise.

[7]The commission found that the April 22 order had a broader impact on lieutenants and captains, a substantial majority of whom stopped wearing any of the pins they had worn before the order was issued.

that jail inmates tended to exploit for their own purposes differences and divisions between and among correction officers, differences like those the presence or absence of pins might advertise. The commission correctly observed, however, that the record contained no evidence that display of union pins had actually threatened, or otherwise adversely affected, jail discipline.

Those factual findings led the commission to conclude that the sheriff's April 22 directive violated G. L. c. 150E, §§ 10(*a*)(1) and 10(*a*)(5), because the sheriff failed to bargain with the union before he issued the directive and because, by issuing the directive, he interfered with the employees' rights.

The sheriff's appeal from the resulting order rests on three principal claims. First is his contention that the union's charges are barred by the statute of limitations because the policy the union challenges had been in effect for more than six months before the union filed its prohibited practice charge in July, 1997. Next, the sheriff contends that creation and promulgation of a policy regulating uniforms is a core management function exempt from the bargaining process. Finally, the sheriff asserts that, even if policies concerning uniforms ordinarily would be a subject for bargaining, special circumstances attend employment in the jail and empower him to adopt unilaterally a policy prohibiting pins or other nonstandard uniform adornments.

As we analyze those contentions, two primary principles are of continuing importance. First, while G. L. c. 150E, §§ 10(*a*)(1) and 10(*a*)(5), as inserted by St. 1973, c. 1078, § 2, often travel in each other's company, the two provisions protect different interests. Section 10(*a*)(1) broadly prohibits an employer from "[i]nterfer[ing with], restrain[ing], or coerc[ing] any employee in the exercise of any right guaranteed under" c. 150E. More narrowly focused, § 10(*a*)(5) prohibits an employer from refusing to bargain in good faith. Violation of the latter provision is almost invariably a violation of the former, although the reverse is not true.

Second, our review of the commission's decision and assessment of the sheriff's claims is cabined by the provisions of G. L. c. 30A, § 14. See G. L. c. 150E, § 11. We therefore must accept the commission's factual findings as long as those find-

ings are supported by substantial evidence. *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 304 (1981).[8] Likewise, we must affirm the commission's decision unless the decision is based upon an error of law, G. L. c. 30A, § 14(7)(*c*), or, in the words of the statute, is "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 30A, § 14(7)(*g*), as amended by St. 1973, c. 1114, § 3. Among other things, those standards require us to "accord deference to the commission's specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions." *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 180 (2002).

Turning from general principles to the sheriff's arguments, we first consider the sheriff's claim that the statute of limitations barred the commission from acting.[9] Resolution of that claim turns upon whether a policy prohibiting pins or other nonstandard uniform adornments was in place more than six months before the union filed its prohibited practice charge. See *Felton* v. *Labor Relations Commn.*, 33 Mass. App. Ct. 926, 927 (1992); 456 Code Mass. Regs. § 15.03 (1993). That question is one of fact, and the hearing officer resolved it against the sheriff when she issued her findings on April 19, 2000. Those findings were supported by substantial evidence, i.e., by "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), as inserted by St. 1954, c. 681, § 1.

To be sure, Frisch's 1995 letter to the union described a "dress code" that prohibited nonstandard pins, and Frisch sent that letter to the union almost two years before the union filed the prohibited practice charge. But the commission found that, until Frisch issued his memorandum on April 22, 1997, officers

---

[8]Because, as we will discuss, all of the commission's critical findings are supported by substantial evidence, we need not determine the effect of the sheriff's election not to challenge any of those findings between the time the hearing officer made them and the time the commission adopted them. See note 2, *supra*. See generally *Albert* v. *Municipal Ct. of Boston*, 388 Mass. 491, 493 (1983).

[9]The relevant period of limitation is contained in a regulation, 456 Code Mass. Regs. § 15.03 (1993), rather than in a statute. In colloquial fashion, however, the parties have referred to the issue as one involving a statute of limitations and we follow suit.

and supervisors alike proceeded without exception as if pin-wearing were completely unregulated. An unenforced and openly ignored directive is no policy at all, or at least the commission so could find, for policies are an organization's living attributes, not artifacts or some manager's hope for future change. Cf. *Winchester Fire Fighters, Local 1654, I.A.F.F.*, 24 M.L.C. 44, 45 (1997).

We turn then to the questions of substance, the first of which is whether prescribing uniforms for employees at the jail, including prohibiting officers from wearing nonstandard badges and buttons, is a core management function exempt from collective bargaining requirements. See generally *Watertown Firefighters, Local 1347* v. *Watertown*, 376 Mass. 706, 714-715 (1978); *Worcester* v. *Labor Relations Commn.*, 438 Mass. at 180-181; *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. 172, 177-181 (1997). In addressing that question, we temporarily put to one side the subject of pins containing union insignia, for the right of employees to wear those pins is attended by special considerations we shall address shortly.

The sheriff's claim that he need not bargain over uniform requirements is firmly rooted in G. L. c. 126, § 9A, the pertinent portion of which says that "[o]fficers and employees of each county penal institution required to wear uniforms shall wear while on duty uniforms prescribed by the sheriff of the county." Moreover, even in the absence of a statute explicitly giving an employer the power to promulgate uniform standards, our decided cases, albeit in dicta, have said that issues regarding the uniforms of law enforcement officers are committed to the employer's sole discretion. See *Boston* v. *Boston Police Superior Officers Fedn.*, 29 Mass. App. Ct. 907, 908 (1990); *Boston* v. *Boston Police Patrolmen's Assn.*, 41 Mass. App. Ct. 269, 272 (1996).[10]

Section 9A of G. L. c. 126 is not one of the statutes that must give way to conflicting terms of a collective bargaining

---

[10] The union argues that correction officers are not police officers and, as a result, the cited cases are irrelevant. Sheriffs, though, have a broad range of duties, many of which parallel those of police officers. Compare *Commonwealth* v. *Baez*, 42 Mass. App. Ct. 565, 569 n.6 (1997), with G. L. c. 41, § 98. Correction officers likewise have and require a paramilitary structure to carry out their responsibilities. Insofar as uniforms are concerned, we therefore

agreement. See G. L. c. 150E, § 7(*d*). See generally *Dedham* v. *Dedham Police Assn.*, 46 Mass. App. Ct. 418, 419-420 (1999). In addition, § 9A is the kind of "specific, narrow statutory mandate" that exempts matters within its scope from the collective bargaining process. See *Lynn* v. *Labor Relations Commn.*, 43 Mass. App. Ct. at 182. Indeed, given the statute's specific content, there is very little to bargain about, save whether the sheriff should or should not carry out his statutory obligation, see *ibid.*, for, in a very real sense, either the correction officers wear "uniforms" or they do not. See *Immigration & Naturalization Serv.* v. *Federal Labor Relations Authy.*, 855 F.2d 1454, 1464 (9th Cir. 1988) ("To allow employees to adorn their uniforms with objects of their own choosing undermines the very purposes that uniforms serve").

The union and the commission nevertheless argue that the commission's finding regarding the long period during which the sheriff had no policy regarding pins and other adornments supports the commission's conclusion that the sheriff is now prohibited from promulgating an antipin policy without first bargaining about its content. That argument necessarily rests on one or both of two premises, neither of which is persuasive. The first premise is that, by failing for so long to require officers to wear a true "uniform," the sheriff has effectively surrendered his power to do so without first engaging in the bargaining process. To accept that argument would require us to conclude that a public official who fails for an extended period to exercise powers the Legislature expressly conferred on him or her could thereby surrender or forfeit those powers. Such a conclusion would be tantamount to reasoning that failure to exercise a power can work an estoppel on the public official in whom the power resides. For good reasons, however, we have almost uniformly held that estoppel does not apply to a public official's performance of statutory obligations or responsibilities. See *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291, 294 (1983); *Municipal Light Co. of Ashburnham* v. *Commonwealth*, 34 Mass. App. Ct. 162, 167, cert. denied, 510 U.S. 866 (1993).

see no meaningful distinction between police officers and uniformed employees of the sheriff's department, regardless of the labels applied to each.

The union's and the commission's second premise is that, by permitting officers to wear pins of their own choosing for an extended period of time, the sheriff created a practice under which the officers' "uniform" consisted of certain specified components — pants, shirts, ties, belts, etc. — plus other components, such as pins, that officers were free to select for themselves. Having created that practice, the premise continues, the sheriff is free to change it only by engaging in collective bargaining.

We doubt that the record will support a conclusion that the sheriff created a "practice" under which the "uniform" included pins and buttons correction officers individually chose. See generally, e.g., *Massachusetts Correction Officers Federated Union* v. *Sheriff of Bristol County*, 55 Mass. App. Ct. 285, 291 & n.6 (2002). But even if it did, nothing in G. L. c. 126, § 9A, suggests that the resulting uniform could be changed only through the bargaining process. Few uniforms are timeless. The power to prescribe uniforms is, therefore, the power to prescribe changes in uniforms.

In sum, to the extent that the sheriff's directive prohibited nonunion buttons and other nonunion accouterments, the directive did not violate G. L. c. 150E, § 10(*a*)(5), or, derivatively, § 10(*a*)(1), and the commission's order that the sheriff "cease and desist" from failing to bargain in good faith on the subject of those pins and accouterments amounted to an error of law.

The sheriff's unilateral prohibition of union pins, however, requires a different analysis. General Laws c. 150E, § 2, as inserted by St. 1973, c. 1078, § 2, provides most public employees, including correction officers, with

> "the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively . . . and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion."

Display of union buttons is a traditional ingredient of the "concerted activity" the statute protects. See, e.g., *Republic Aviation Corp.* v. *National Labor Relations Bd.*, 324 U.S. 793,

802 n.7 (1945), quoting from *Republic Aviation Corp.*, 51 N.L.R.B. 1186, 1187-1188 (1943) ("the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity"); Teeter, Banning the Buttons: Employer Interference with the Right to Wear Union Insignia in the Workplace, 80 Ky. L.J. 377, 379 & n.17 (1992) (same). Consequently, the commission has held that, "[i]n the absence of special circumstances, an employer's rule prohibiting the wearing of union insignia violates [G. L. c. 150E, § ] 10(*a*)(1)." *Dighton School Comm.*, 8 M.L.C. 1303, 1305 (1981). See *Asociacion Hosp. del Maestro, Inc.* v. *National Labor Relations Bd.*, 842 F.2d 575, 577 (1st Cir. 1988); Kheel, 3 Labor Law § 10.07(1), at 10-87 (1997) ("Employer restrictions on the display of union insignia are invalid absent a showing of special circumstances that justify the restrictions").[11]

We do not think the right to prescribe uniforms contained in G. L. c. 126, § 9A, supersedes the officers' G. L. c. 150E, § 2, right to wear union insignia absent a showing of special circumstances. The "principles appli[ed] in construing the interrelation of different statutes" require us to give "reasonable effect to both statutes and [to] create[] a consistent body of law." *Boston* v. *Board of Educ.*, 392 Mass. 788, 792 (1984). There is no explicit indication that the Legislature, in passing c. 126, § 9A, intended to override the well-established right to wear union insignia, and the two provisions are not so inconsistent with one another that "both cannot stand." *Commonwealth* v. *Graham*, 388 Mass. 115, 125 (1983). Indeed, in *United States Dept. of Justice, Immigration & Naturalization Serv.* v. *Federal Labor Relations Authy.*, 955 F.2d 998 (5th Cir. 1992) (*INS*), a case on which the sheriff heavily relies for his analysis

---

[11]Issues involving the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights lie just beneath the surface of any case involving a restriction on an employee's right to communicate associational activity by means of union insignia. See *United States Dept. of Justice, Immigration & Naturalization Serv.* v. *Federal Labor Relations Authy.*, 955 F.2d 998, 1005 (5th Cir. 1992); *Scott* v. *Meyers*, 191 F.3d 82, 86 (2d Cir. 1999). Cf. *Leonard* v. *Columbus*, 705 F.2d 1299 (11th Cir. 1983), cert. denied, 468 U.S. 1204 (1984) (American flag); *Dunn* v. *Carroll*, 40 F.3d 287, 291-292 (8th Cir. 1994) (same). Because no party has raised constitutional claims, however, we do not address the issue here.

of special circumstances, an analysis we discuss below, the court held that the management rights provisions of the Federal Labor Relations Act, 5 U.S.C. § 7106(b)(1) (1996), did not explicitly supersede the employee rights provisions of 5 U.S.C. § 7102 (1996), a statute similar to, but containing fewer employee rights than, G. L. c. 150E, § 2. As a consequence, the court stated that uniformed INS employees were presumptively entitled to wear union badges and buttons notwithstanding the employer's right to prescribe uniforms. *INS*, 955 F.2d at 1003.

We, too, think that the wearing of union insignia, unlike guardian angel buttons or tie clips, is a right protected by G. L. c. 150E, § 2, which, notwithstanding G. L. c. 126, § 9A, cannot be denied, absent special circumstances or a "clear and unmistakable" indication that it was waived as a result of the bargaining process. *National Labor Relations Bd.* v. *Mead Corp.*, 73 F.3d 74, 79 (6th Cir. 1996), quoting from *Metropolitan Edison Co.* v. *National Labor Relations Bd.*, 460 U.S. 693, 708 (1983).[12]

Turning, then, to the issue of special circumstances, both the union and the commission argue that none exist in this case. The sheriff disagrees, urging that special circumstances do exist and, as noted, relies heavily on the Fifth Circuit's treatment of special circumstances in the *INS* case. There, the court's treatment of the issue resulted in the following conclusion:

> "The INS's anti-adornment/uniform policy is critical to its mission, in that it promotes uniformity, esprit de corps and discipline, and creates an appearance of neutrality and impartiality. Thus, even though the border patrol is not military, we hold that its law-enforcement mission and the means of accomplishing that mission are comparable in significant ways. It follows that its anti-adornment/uniform policy is similarly entitled to deference. We further hold that, when a law enforcement agency enforces an anti-adornment/uniform policy *in a consistent and nondiscrimi-*

---

[12]We venture no opinion on whether a waiver of the statutory right to wear union insignia in a collective bargaining contract would be legally enforceable. See *Lodge 743, International Assn. of Machinists* v. *United Aircraft Corp.*, 337 F.2d 5 (2d Cir. 1964), cert. denied, 380 U.S. 908 (1965) (distinguishing between enforceable and unenforceable waivers of statutory rights).

*natory manner, a special circumstance exists,* as a matter of law, which justifies the banning of union buttons" (emphasis added).

*INS,* 955 F.2d at 1004.

"Special circumstances" rarely, if ever, are found in the absence of a comprehensive ban on all nonstandard adornments. See, e.g., *Dighton School Comm.,* 8 M.L.C. at 1305 ("We are further convinced that no special circumstances exist to prohibit [union] buttons by the fact that other buttons were worn . . . without . . . interference or comment by the school administration. A rule which is enforced only against union buttons demonstrates the lack of any truly legitimate purpose for the rule"). See also *National Labor Relations Bd. v. Harrah's Club,* 337 F.2d 177, 178 (9th Cir. 1964); *Burger King Corp. v. National Labor Relations Bd.,* 725 F.2d 1053, 1055 (6th Cir. 1984); *Immigration & Naturalization Serv. v. Federal Labor Relations Authy.,* 855 F.2d at 1465. The record in this case, however, discloses nothing remotely resembling a comprehensive prohibition.

We agree with the sheriff that "the need for discipline, uniformity and an absolutely impartial appearance exists at the Jail." People with violent tendencies live at the jail. A paramilitary organization and command structure are essential for the safety of inmates and correction officers alike. But the long period before April 22, 1997, during which the sheriff had no policy prohibiting pins, and the fact that his April 22 edict appears to have fallen with particular force on union pins, supports the commission's conclusion that no special circumstances connected to the jail's mission, command structure, need for discipline or other functional requirement justified the sheriff's unilateral prohibition of the union buttons employees presumptively were entitled to wear. See *Boise Cascade Corp.,* 300 N.L.R.B. 80, 84 (1990) (evidence that pins were worn for six months without incident was "most important point" in determining absence of special circumstances).[13] Therefore, the commission's conclusion that the April 22 directive, insofar as it affected union buttons, violated

[13]We do not preclude the possibility that circumstances may change over time in a way that enables the sheriff to meet his burden at some point in the

G. L. c. 150E, §§ 10($a$)(1) and 10($a$)(5), was supported by substantial evidence and did not amount to an error of law.

In light of the foregoing, paragraphs 1(a), 1(b), 2(a), and 2(b) of the commission's order are reversed insofar as they pertain to badges, pins, and any nonstandard uniform attire other than pins and badges containing union insignia. The commission shall modify the "Notice to Employees" referenced in paragraph 2(c) of its order so that it is consistent with this opinion. In all other respects, the commission's order is affirmed.

*So ordered.*

---

future. See, e.g., *Meijer, Inc.* v. *National Labor Relations Bd.*, 130 F.3d 1209, 1217 (6th Cir. 1997) (requiring "affirmative showing" of negative impact).