HIGHER EDUCATION COORDINATING COUNCIL/ROXBURY
COMMUNITY COLLEGE *vs.* MASSACHUSETTS TEACHERS'
ASSOCIATION/MASSACHUSETTS COMMUNITY COLLEGE
COUNCIL.

Suffolk. April 2, 1996. - June 20, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Arbitration,* Authority of arbitrator, Judicial review, Collective bargaining,
   Scope of arbitration, Damages. *Education,* Public colleges and universi-
   ties. *Higher Education Coordinating Council. Public Employment,* Col-
   lective bargaining. *Labor,* Arbitration, Collective bargaining, Public
   employment.

State college and university trustees' authority under G. L. c. 15A, § 22,
   with respect to the appointment, dismissal and tenure of its teaching
   personnel is nondelegable. [27-31]
An arbitrator, hearing the grievance of a retrenched State college faculty
   member, exceeded the scope of his authority in directing the State col-
   lege in question to create and assign to the grievant a full-time position
   in the college's mathematics department, where the college trustees' de-
   cision to abolish the grievant's position was within the trustee's exclusive
   managerial prerogative. [31-33]
Where an award of damages was within the power of an arbitrator to
   award in arbitrating a grievance by a retrenched State college faculty
   member, but the award was ambiguous as to the measure of damages,
   the matter was ordered remanded to the arbitrator for further proceed-
   ings. [33]

CIVIL ACTION commenced in the Superior Court Depart-
ment on June 2, 1994.

The case was heard by *Gordon L. Doerfer,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Eileen A. Cenci* for the defendant.

*Cynthia S. Denehy* for the plaintiff.

GREANEY, J. We transferred this case to this court on our
own motion to decide a question concerning the authority of
the Higher Education Coordinating Council (council) and the

boards of trustees of the various public institutions of higher education in the Commonwealth. We inquire whether the council and the boards of trustees may agree to submit to binding arbitration the decision to create a vacancy in an academic department at one of these institutions, and the authority to determine the qualifications, and order the appointment, of a person to that vacancy as a tenured faculty member or whether this question is one within the exclusive managerial prerogative of the council and the boards of trustees, that may not be delegated for decision by arbitration. A judge in the Superior Court denied the motion of the plaintiff, the Higher Education Coordinating Council/Roxbury Community College (college), pursuant to G. L. c. 150C, § 11 (a) (3) (1994 ed.),[1] to vacate an arbitration award directing the college to create, and assign to the grievant, a full-time position in the college's mathematics department. The plaintiff timely appealed. We vacate so much of the judgment as required appointment of the grievant to a faculty position at the college and remand the case to the Superior Court with instructions that it be remanded to the arbitrator for calculation of an award of damages, if any.

We summarize, with minor additions, the facts as taken from the arbitrator's opinion. Effective August 31, 1992, the electronics technology program (program) at the college was eliminated due to a "dramatic decrease" in student enrollment. The grievant, the sole remaining faculty member in the program, and a full professor who had been a member of the college faculty for fourteen years, faced the loss of his position through retrenchment.[2] The grievant had been hired in November, 1978, and had received tenure in 1986. He had been awarded a bachelor of science degree in civil engineering

---

[1]General Laws c. 150C, § 11 (a) (3) (1994 ed.), provides, in pertinent part, that an arbitrator's award shall be vacated if "the arbitrators exceeded their powers."

[2]Section 19.01 (A) of the agreement provided that "[t]he Board may from time to time retrench one (1) or more members of the bargaining unit whenever in the exercise of its sole discretion it shall have determined that such retrenchment is required due to bona fide financial reasons or where there occurs within an institution a bona fide discontinuance, reduction or shift in academic emphasis or professional service needs or for other related bona fide programmatic reasons." It is undisputed that termination of the program in which the grievant had been teaching was warranted and proper.

from Duke University, and a master of science degree in civil engineering from the University of North Carolina. As an undergraduate, he had taken six courses in mathematics; as a graduate student, he had taken one additional course in that subject. He had taught four introductory mathematics courses and a general science course during his appointment at the college. In the fall of 1992, around the time the grievant's retrenchment took effect, there were thirteen sections of introductory mathematics and three sections of science being taught by part-time instructors. A full-time, tenured professor of mathematics had died in April, 1992, and had not been replaced. The course load of a full-time faculty member was approximately four courses. The grievant requested that the employer transfer him to a full-time teaching position in either the mathematics or the science department. The request was denied, and the grievant was retrenched. He then filed the grievance which is the subject of this decision.

The board of regents, predecessor to the council, compare G. L. c. 15A (1990 ed.) with G. L. c. 15A, as appearing in St. 1991, c. 142, § 7, acting on behalf of the Massachusetts regional community colleges, entered into a collective bargaining agreement (agreement) effective July 1, 1990, through June 30, 1993, with the Massachusetts Community College Council/Massachusetts Teachers Association (union). The agreement defined the responsibilities of a community college in the event of the possible retrenchment of a member of the bargaining unit. Section 19.03 provided as follows:

> "Whenever it shall have been determined to be necessary to retrench any unit member, the College shall reassign an affected unit member to a position within another . . . department/work area . . . within the College at which the retrenchment occurs; provided, however, that such reassignment shall only be made to a then existing vacancy in such department/work area . . . . No such reassignments shall be made unless such unit member is qualified for such reassignment as determined by the president of the College or his/her designee. A unit member shall be deemed to be qualified by the president of the College or his/her designee if he/she has taught at least eight (8) sections at the College in the work area to which the reassignment is to occur . . . ."

The agreement defined "vacancy," in § 1.02, as "a position for which funding is available and which the administration intends to fill." Section 19.04 (A) of the agreement provided that "[t]he president of the College shall make reasonable efforts to effect the required retrenchment by exhausting attrition and reassignment."

The arbitrator concluded that the college had violated the agreement by not assigning the grievant to a full-time faculty position in the mathematics department. He noted that management normally has the right to determine whether a vacancy exists and whether to fill it. He nonetheless concluded that this right was limited by the college's obligation of reassignment in the event of retrenchment, and concluded that management's authority to determine when a vacancy existed and whether to fill it was not absolute. In the circumstances, the arbitrator concluded that it was arbitrary and capricious on the part of the college not to combine some courses being taught by part-time faculty members into a full-time position for which the grievant could be considered, and to which he would be entitled under the agreement if he were found to be qualified.[3]

Having concluded that a vacancy existed in the mathematics department, the arbitrator also found that the grievant was qualified to fill it despite his lack of any degree in mathematics.[4] This finding was based on the "large mathematical component" in the grievant's undergraduate and graduate curriculum, a presumption that, as a practicing engineer, the grievant must have used mathematical skills, and the fact that the college had assigned him to teach introductory mathematics courses on four occasions in the past.[5] The arbitrator also noted that the decision not to assign the grievant to the science or the mathematics department was made by the divisional and department heads, although the president of the college had wanted to accommodate the

[3]The arbitrator found that no vacancy to which the grievant might have been appointed existed in the science department.

[4]Article IV of the agreement sets forth the rights and responsibilities which "shall remain vested" in management, including the right "[t]o hire all employees, to determine their qualifications and the conditions for their continued employment or their dismissal or demotion and to promote and transfer all such employees." Section 4.01 (2).

[5]The grievant had taught three sections of introductory algebra, and one basic mathematics course.

grievant. Among the duties of a department chair, set out in the agreement, is the responsibility to "[a]dvise on the discipline competency of all applicants for vacancies within the department after consultation with members of the department." Section 20.5 (C). The arbitrator's decision refers to testimony from the division chair that the mathematics department "needed someone with experience and knowledge in developmental education." According to the college, there was also uncontested testimony that a full-time faculty member in the mathematics department would be required to have a degree in that discipline and would be expected to be capable of teaching the full range of courses offered by the department. The arbitrator, however, determined that the department had resisted the appointment of the grievant due to concerns about the seniority in the department the grievant would acquire based on his years of service to the college. The arbitrator concluded that the college also had been arbitrary and capricious in taking the position that the grievant was not qualified for a full-time tenured appointment in the college's mathematics department.

1. This court has consistently acknowledged that "[o]ur review of an arbitrator's award is limited in scope. 'We do not, and cannot, pass on an arbitrator's alleged errors of law and, absent fraud, we have no business overruling an arbitrator because we give a contract a different interpretation.' *Concerned Minority Educators* v. *School Comm. of Worcester*, 392 Mass. 184, 187 (1984). . . . However, 'the question whether the arbitrator[ ] acted in excess of the authority conferred on [him], as claimed in the present case, is always open for judicial review.' *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 792 (1977)." *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n*, 395 Mass. 651, 654 (1985). Thus, unless the arbitrator's decision infringed on an area of educational policy reserved for the exclusive judgment of the administrators of the college, it cannot be disturbed.

Relying on a body of law that has been developed and applied in the context of public elementary and secondary schools, the college argues that the decisions whether to create a new position and what qualifications to require in connection with that position are matters within the exclusive management prerogative of the college and, therefore, beyond the scope of collective bargaining. As the college suggests,

"this court has held that specific appointment determinations, and decisions to abolish positions are within the exclusive managerial prerogative of a school committee." *Boston Teachers Union, Local 66* v. *School Comm. of Boston,* 386 Mass. 197, 211 (1982). Similarly, a school committee has exclusive authority to "determine on an annual basis the size of its teaching staff." *Id.* at 212. The authority to specify the qualifications necessary for a faculty or administrative appointment and to hire personnel possessing those specified qualifications also has been considered to be the exclusive prerogative of a school committee. See *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n, supra; Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Ass'n,* 375 Mass. 522 (1978). Nonetheless, a school committee may bind itself to follow certain procedures with respect to decisions committed to its exclusive authority, and a failure to observe those procedures may be the basis for an arbitrable grievance. See *School Comm. of W. Springfield* v. *Korbut,* 373 Mass. 788, 795-797 (1977); *School Comm. of Danvers* v. *Tyman,* 372 Mass. 106, 113-115 (1977).

What has been referred to as the doctrine of nondelegability rests largely on the notion that the quality of education provided to the Commonwealth's school children will depend, to some significant degree, on school administrators' relatively unfettered discretion to make decisions concerning staffing and personnel in light of shifts in curricular emphasis, fluctuating student enrollments, and the availability of resources. It has been observed that "[t]he success of a school system depends largely on the character and ability of the teachers. Unless a school committee has authority to employ and discharge teachers it would be difficult to perform properly its duty of managing a school system." *Davis* v. *School Comm. of Somerville,* 307 Mass. 354, 362 (1940), citing G. L. c. 71, §§ 37 and 38. See *Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Ass'n, supra* at 526.

Our decisional law has acknowledged that tension exists between legislation authorizing collective bargaining agreements protecting the rights of public employees, see G. L. c. 150E, §§ 1, 2 (1994 ed.), and the recognition of an exclusive domain of authority for local school committees, protected by the nondelegability doctrine. See *School Comm. of Danvers* v. *Tyman, supra* at 111. Our view, however, has been that statu-

tory directives concerning a school committee's duties and responsibilities expressed a legislative intent to recognize and protect that exclusive authority. That intent we found expressed in G. L. c. 71, §§ 37 and 38 (1992 ed.) (prior to June 18, 1993),[6] which, taken together, provided that a school committee should have "general charge of all the public schools," including the authority to "elect and contract with the teachers of the public schools." The college contends that G. L. c. 15A, § 22 (1994 ed.), reflects an equivalent legislative intent to protect the trustees' unfettered authority to make decisions bearing on core issues of educational policy.

General Laws c. 15A, § 22, which deals with the powers and duties of the boards of trustees of public institutions of higher education, provides, in pertinent part, as follows:

> "Each board of trustees of a community college or state college shall be responsible for establishing those policies necessary for the administrative management of personnel, staff services and the general business of the institution under its authority. Without limitation upon the generality of the foregoing, each such board shall: . . . appoint, transfer, dismiss, promote and award tenure to all personnel of said institution . . . ."

The language of § 22 is more emphatic and detailed than were the cognate provisions of c. 71 in defining the duties and the scope of the authority assigned to the boards of trustees of the Commonwealth's public colleges and universities. Various provisions of c. 15A acknowledge the importance of providing a high quality and affordable program of higher education, see G. L. c. 15A, § 1 (1994 ed.), a point which can hardly be doubted at a time when a college education is a necessary predicate for so many employment and other op-

___

[6]The Education Reform Act, St. 1993, c. 71 (Act), significantly revised the governance structure of public schools in the Commonwealth. Among other changes, the Act shifted primary responsibility for hiring, disciplining, and terminating teachers and administrative personnel from the local school committees to school principals, subject to the supervision and direction of the local school superintendents. See G. L. c. 71, § 59B (1994 ed.). Responsibility for hiring or terminating a school superintendent lies with the school committee, which retains the authority to "establish educational goals and policies for the schools in the district." G. L. c. 71, § 37 (1994 ed.).

portunities. At a general level, similar considerations apply to the governance of all public educational institutions. Their administrators must make the most effective possible use of scarce public resources in responding to the educational needs of the Commonwealth's students. Faculty and teaching appointments, in particular, are the defining elements of an educational institution's quality and programs. As a matter of policy and legislative directive, the college, through its board of trustees and school administrators, should retain sole authority for determining the content of its educational curriculum, and the optimum system for the delivery of the academic programs and related services it deems necessary.[7]

The union correctly points out that the enabling legislation of the Massachusetts Bay Transportation Authority explicitly reserves to it certain managerial rights, including the hiring and termination of employees, that may not be the subject of a collective bargaining agreement, see G. L. c. 161A, § 19 (1994 ed.), and suggests that we should decline to find nondelegable managerial authority where the relevant legislation does not explicitly provide for it. "The Legislature is free specifically to define or enumerate the proper subjects for public sector collective bargaining." *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. 65, 71 n.12 (1979). The Legislature could have indicated its disagreement with this court's long-standing interpretation of former G. L. c. 71, §§ 37 and 38, at any time by doing away with the nondelegability doctrine by statute. It has not done so. The relevant language of G. L. c. 15A, § 22, closely resembles that

---

[7]We are not persuaded by the union's argument that the nondelegability doctrine rests solely on a perception that an elected body might be subject to undue influence by a union. An appointed official, who serves at the behest of an elected official, may be equally vulnerable to pressure that might "distort[ ] the normal political process for controlling public policy." *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 378 Mass. 65, 71 (1979). As the union concedes, application of the nondelegability doctrine has not been confined to situations where the management is comprised of elected officials. The school committee of Boston, for example, is an appointed body. See St. 1991, c. 108. See also *Boston* v. *Boston Police Patrolmen's Ass'n*, 8 Mass. App. Ct. 220, 226-227 (1979) (appointed police commissioner possesses nondelegable managerial authority). Cf. *Secretary of Admin.* v. *Massachusetts Org. of State Eng'rs & Scientists*, 408 Mass. 837, 839 (1990) (arbitrator concluded that appointed Secretary had exclusive nondelegable managerial authority to lay off public works personnel).

found in former §§ 37 and 38, and we may assume that the Legislature would approve a comparable interpretation.

We consider it a difference without significance that, while a school committee acts as the bargaining agent and the entity holding nondelegable authority, in the case of higher education the council is the bargaining agent while the board of trustees has statutory authority for appointments, dismissals, and tenure decisions. See G. L. c. 150E, § 1 (1994 ed.); G. L. c. 15A, § 22.[8] Noting that, by statute, a college's board of trustees contains a student representative, see G. L. c. 15A, § 21 (1994 ed.), the union contends that it "would be anomalous indeed" if a body including an undergraduate were deemed to have nondelegable managerial authority to determine the content of academic programs and qualifications of faculty members seeking reassignment while the president of the college could not exercise this authority. General Laws c. 15A, § 22, second par., authorizes "[t]he board of trustees of each institution [to] delegate to the president of such institution any of the powers and responsibilities [enumerated in the section]," including, therefore, the power to "appoint, transfer, dismiss, promote and award tenure." In keeping with the statutory framework, these decisions may be (and, we may surmise, almost certainly are), made by the president of the college and the president's designees.

We conclude that these considerations warrant application of the nondelegability doctrine to collective bargaining agreements between administrators and employees of public colleges and universities.

2. We turn to the question whether the arbitrator's award infringed on the exclusive managerial prerogatives of the college's administrators. This determination is made on a case-

---

[8]As was previously noted, see note 6, supra, the Act revised the governance structure of public elementary and secondary school, shifting primary responsibility for hiring and terminating personnel from the local school committees to superintendents and principals. The union has suggested that this alteration calls into question the continuing vitality of the long line of cases defining the scope of the nondelegability doctrine. While the issue is not squarely presented in this case, we note that, in the absence of an explicit legislative directive, we would be reluctant to conclude that passage of the Act indicated an intent to alter a well-established principle, presumptively known to the Legislature, governing collective bargaining between school administrators and employee representatives. See Waldman v. American Honda Motor Co., 413 Mass. 320, 323 (1992), and cases cited.

by-case basis. *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n*, 395 Mass. 651, 654 (1985); *School Comm. of Boston* v. *Boston Teachers Union, Local 66*, 372 Mass. 605, 614 (1977). The college contends that the arbitrator exceeded his powers in directing it to create a full-time position in the mathematics department and in finding that the grievant was qualified for the position.

We have not had occasion to consider whether an award which required a public school employer to create a vacancy that otherwise would not have existed is beyond the scope of an arbitrator's power. However, we have said that a decision to abolish a particular position is a decision within the exclusive managerial prerogative of a school committee. See *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 689-690 (1976); *School Comm. of Hanover* v. *Curry*, 369 Mass. 683 (1976). See also *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 211 (1982). In the circumstances of this case, the order to create a position was closely analogous to an order foreclosing school administrators from abolishing a faculty position. The arbitrator reasoned that the college was arbitrary and capricious in declining to create a position in part because a professor who taught full time in the college's mathematics department recently had died. In effect, the decision not to create a full-time position in the mathematics department was a decision to abolish the full-time tenured position that had been held by the deceased professor. Under the *Curry* and *Raymond* cases, this decision was within the exclusive managerial prerogative of the college's administrators. See *School Comm. of Lynnfield* v. *Trachtman*, 11 Mass. App. Ct. 524, 527-529, *S.C.*, 384 Mass. 813 (1981). Moreover, it is obvious that considerations that would be termed matters of educational policy inevitably would enter into the decision to create a full-time faculty position. These considerations presumably would include, among others, possible fluctuations in enrollment in an academic department; current disciplinary needs and the need for future flexibility in course offerings; and, because the creation of a full-time tenured position has long-term budgetary implications, the most effective use of limited public funds. We need not consider whether the finding that the grievant was qualified for a position in the mathematics department exceeded the arbitrator's powers (but see *School*

*Comm. of Boston* v. *Boston Teachers Union, Local 66,* 25 Mass. App. Ct. 903, 904 [1987]), because we conclude that the preliminary finding that a vacancy existed was improper.

3. "A[n] award of damages 'is separable' from an arbitrator's mistaken conclusion that a particular decision by [school administrators] is arbitrable.' *School Comm. of Boston* v. *[Boston Teachers Union, Local 66,* 395 Mass. 232, 235 (1995)]." *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n, supra* at 657. An arbitrator's finding that an employer has violated a collective bargaining agreement may support an award of damages, even when other aspects of the award exceed the scope of arbitral authority. *Id.* Although, in ordering the grievant's appointment to a position in the mathematics department, the arbitrator exceeded the scope of his arbitral powers, it was within his power to award damages for the college's violation of the agreement, so long as the damages were in an amount that would not "have the effect of compelling reinstatement." *Id.,* quoting *School Comm. of Lynnfield* v. *Trachtman, supra* at 813. The arbitrator's award provided, somewhat ambiguously, that the grievant was to be made "whole for lost benefits under the Contract, minus interim earnings, if any." At the union's request, the arbitrator agreed to retain jurisdiction over the matter for ninety days to calculate the amount of damages due to the grievant. In view of this language, we are unable to determine the measure of damages the arbitrator intended to award.

4. The judgment of the Superior Court confirming the arbitration award is to be modified to (1) grant in part the college's motion to vacate the arbitrator's award insofar as it ordered the grievant's appointment to a full-time faculty position in the mathematics department; and (2) to remand the case to the arbitrator for a calculation of the amount of damages, if any, to be awarded to the grievant for the college's violation of the agreement.

*So ordered.*