TOWN OF WATERTOWN *vs.* WATERTOWN MUNICIPAL
EMPLOYEES ASSOCIATION
(and a companion case[1]).

No. 03-P-1586.

Middlesex. December 9, 2004. - April 15, 2005.

Present: KANTROWITZ, DOERFER, & KAFKER, JJ.

*Arbitration,* Arbitrable question. *Public Employment,* Collective bargaining, Termination. *Labor,* Collective bargaining, Grievance procedure.

In an employment dispute, this court concluded that a Superior Court judge properly vacated an arbitrator's decision that a particular grievance was not arbitrable, where the arbitrator's decision exceeded his powers and penalized and indirectly intruded upon a collective bargaining right, and where the arbitrator's decision was not supported by contractual language from the arbitration provision of the collective bargaining agreement. [289-293]

In a civil action, a Superior Court judge properly affirmed an arbitrator's finding that there was no just cause for the plaintiff employee's termination. [293-294]

CIVIL ACTION commenced in the Superior Court Department on November 14, 2001.

The case was heard by *Nonnie S. Burnes,* J., on a motion for judgment on the pleadings, and entry of final judgment was ordered by *Paul A. Chernoff,* J.

CIVIL ACTION commenced in the Superior Court Department on December 9, 2002.

The case was heard by *R. Malcolm Graham,* J., on motions for judgment on the pleadings.

*Darren R. Klein* for the plaintiff.

*Jack J. Canzoneri* for the defendant.

KAFKER, J. John R. Shutt, an employee of Watertown (town)

---

[1]The companion case is between the same parties and involves the same controversy.

and the grievant, was terminated by the town on the basis that he abused unpaid leave under the Family Medical Leave Act (FMLA). The relevant events occurred while Shutt was a member of a collective bargaining unit represented by the American Federation of State, County, and Municipal Employees, Local 1210 (AFSCME). The town and AFSCME had entered into a collective bargaining agreement (agreement) that provided for binding arbitration. The day after Shutt's employment was terminated, however, and before a grievance had been filed, a new union, Watertown Municipal Employees Association (WMEA),[2] was certified as the collective bargaining representative. The grievance was pursued for Shutt by WMEA. An arbitrator concluded that the grievance was not arbitrable.

WMEA filed a complaint to vacate and remand. A Superior Court judge reversed, finding the grievance to be arbitrable, and remanded the case to the arbitrator. The arbitrator then decided the merits of the grievance, concluding that there was not just cause for Shutt's termination. The town then filed a complaint to vacate the arbitration award. A second Superior Court judge affirmed the arbitrator's award. The town appealed from both Superior Court judgments.[3] WMEA cross-appealed from the denial of its claim for attorney's fees. We affirm.

*Facts and procedural history.* Shutt began working for the town as a motor equipment operator on July 31, 1990, and became a heavy equipment operator on May 21, 1996. On September 27, 1999, Shutt injured his back at work while loading asphalt onto a front-end loader. He was out of work and collected workers' compensation benefits until November 1, 1999, when a doctor determined that he could return to work. The town directed Shutt to return to work on January 18, 2000. Instead, Shutt remained out on vacation leave until February 1, 2000. He then returned to work. On March 13, Shutt underwent a lumbar myelogram,[4] in which his back was found to be normal or "unremarkable." After the procedure, he complained of dizziness and severe headaches.

---

[2]WMEA was the successor union to AFSCME.

[3]Separate judgments were entered in each case. Appeals were taken from both judgments. See note 1, *supra.*

[4]This is a procedure in which dye is injected into a patient's spinal column. A needle called a spinal tap is used. A CAT scan follows.

At a subsequent arbitration hearing, Shutt claimed, for the first time, that on March 15, 2000, he suffered a five-hour period of unconsciousness after driving his work van into a wall. He did not report the incident to his supervisor, coworkers, or any examining physician. On March 16, he went to the hospital where a doctor administered an emergency blood patch to stop spinal fluid from leaking where the spinal tap had been inserted. Shutt's doctor advised him not to return to work and sent notes to the town to that effect between March 16 and April 13, 2000. After learning that he had exhausted all sick and vacation time, Shutt opted to exercise rights to unpaid leave under FMLA[5] on April 5, 2000.

On April 13, 2000, Shutt was reexamined by his doctor, who concluded that Shutt was still unable to work. The doctor relied, at least in part, on Shutt's assertions that he was unable to perform routine activities without great pain and that he could not drive, wash dishes, or get out of bed without great difficulty. She ordered further testing of his back and completed the FMLA form indicating that Shutt could not perform work of any kind. Shutt received epidural blocks to relieve pain on May 10 and June 15, 2000.

The town authorized a private investigator to conduct surveillance of Shutt. The investigator videotaped Shutt over six days between April 17 and June 17, 2000, and reported Shutt's various documented activities during that time, including driving to and from a number of destinations, buying and carrying a half-case of beer, pumping gas, and on May 27, purchasing mulch and shoveling it from the back of his pick-up truck. Each of these activities contradicted Shutt's claims of his inability to walk, sit, stand, bend forward, drive, or get into and out of a car without great difficulty.

On July 10, 2000, the town advised Shutt that his FMLA leave had expired and that it would consider him to have abandoned his job if he did not report by July 13. Shutt thereafter produced a note from his doctor saying that he could return to work on August 1, and Shutt in fact did so.

---

[5]Under certain circumstances the FMLA applies to an eligible employee with a "serious health condition," as well as to an employee's care of designated family members. See 29 U.S.C. § 2612(*a*)(1)(D) (2000).

On August 16, 2000, the town manager notified Shutt, pursuant to G. L. c. 31, § 41, that he was to appear at a disciplinary hearing for receiving FMLA leave to which he had not been entitled. After a hearing on September 6, 2000, the town manager adopted the findings and recommendations of the hearing officer and terminated Shutt's employment on October 16, 2000. Shutt received the notice of termination on October 20, 2000.

Discipline and discharge in violation of the agreement between AFSCME and the town were subject to grievance and arbitration procedures.[6] The agreement covered the time period from July 1, 1997, to June 30, 2000. It also included the following provision: "If a successor agreement is not reached by June 30, 2000, the terms of this agreement shall remain in full force and effect until a successor agreement is executed." No successor agreement was ever negotiated with AFSCME. Furthermore, on October 17, 2000 — the day after Shutt's termination — WMEA became the exclusive bargaining agent for Shutt's bargaining unit. On October 27, 2000, WMEA notified the town that it sought to arbitrate Shutt's termination. At that time, there was no agreement in effect with WMEA.

In his initial decision, the arbitrator concluded that the grievance was not arbitrable because there was no statutory or contractual basis to arbitrate the grievance. In particular, the arbitrator determined that there was no evidence that the town agreed to be contractually bound to WMEA by the agreement negotiated by AFSCME. On WMEA's complaint to vacate the award under G. L. c. 150E, § 11, a Superior Court judge denied the town's motion for judgment on the pleadings and ruled that the grievance was arbitrable and that the arbitrator had exceeded his powers in deciding to the contrary. The judge remanded for a decision on the merits.

On remand, the arbitrator ruled that the procedural prerequisites to arbitration had been met and that the town's termination of Shutt was not for just cause. The arbitrator ordered Shutt

---

[6]The agreement defined a grievance to be "a complaint that there has been as to an employee a violation, misinterpretation or inequitable application of any of the provisions of this Agreement." After various preliminary steps grievances were arbitrable.

reinstated with back pay and benefits, notwithstanding several findings that Shutt had lied about his medical condition. The arbitrator defined the issue as "whether as of May 27, 2000 Shutt was no longer entitled to FMLA leave because he did not suffer from a serious health condition," and concluded that Shutt's improvement over time did not render either the basis for his FMLA leave or his condition illusory. On cross motions for judgment on the pleadings, a Superior Court judge confirmed the arbitrator's award and denied WMEA's motion for attorney's fees predicated upon Federal practice permitting an award of fees when a challenge to an arbitration award is "without justification."

*Discussion.* A. *Arbitrability.* The initial question presented is whether the first Superior Court judge properly vacated the arbitrator's decision that the dispute was not arbitrable. The fundamental principles guiding this analysis have been set out by the Supreme Judicial Court and the United States Supreme Court in a series of collective bargaining agreement cases including a number interpreting agreements that had expired prior to arbitration.

"The first principle is that 'arbitration is a matter of contract' " and cannot therefore be imposed if it is not a part of the bargained-for exchange. *Local No. 1710, Intl. Assn. of Fire Fighters* v. *Chicopee,* 430 Mass. 417, 420-421 (1999), quoting from *AT&T Technologies, Inc.* v. *Communications Wkrs. of America,* 475 U.S. 643, 648 (1986). Courts recognize, however, that "a collective bargaining agreement is not an ordinary contract." *John Wiley & Sons* v. *Livingston,* 376 U.S. 543, 550 (1964). A collective bargaining agreement governs an entire, evolving labor-management relationship. It is negotiated in a highly regulated environment that determines the certification and decertification of unions and establishes bargaining obligations of unions and employers. A collective bargaining agreement also promotes the equitable, efficient, and peaceful resolution of workplace disputes. Arbitration provisions play an important part in the entire process, as they provide for the expeditious resolution of workplace disputes by decisionmakers with expert knowledge of the common law of the shop. *United Steelworkers of America* v. *Warrior & Gulf Nav. Co.,* 363 U.S. 574, 580-582 (1960).

For these reasons, where the collective bargaining agreement "contains an arbitration clause, there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage . . . particularly . . . where the clause is . . . *broad*' (emphasis added)." *Local No. 1710, Intl. Assn. of Fire Fighters* v. *Chicopee, supra* at 421, quoting from *AT&T Technologies, Inc.* v. *Communication Wkrs. of America,* 475 U.S. at 649. In addition, when the arbitration provision being interpreted involves expiring contracts and changes in union representation, courts carefully consider the statutory context in which the agreements are negotiated. See, e.g., *Nolde Bros.* v. *Local 358, Bakery & Confectionery Wkrs. Union,* 430 U.S. 243, 254 (1977) (discussing how parties drafted their arbitration clause "against a backdrop of well-established federal labor policy favoring arbitration").

The agreement here provided for arbitration of discharges. Absent the change in bargaining representation prior to the filing of the grievance, the agreement would clearly have covered Shutt's grievance. The agreement contained an extension provision that expressly provided that the agreement would remain in full force and effect until a successor agreement was negotiated. In the instant case, no successor agreement was negotiated during the relevant time. Therefore, at least until the change in union representation on October 17, 2000, the agreement and the arbitration provision were in place and applicable. Also, prior to that date, all the events that were the subject of the grievance and everything but the filing of the grievance had occurred.

Even if the agreement could be characterized as having expired, "[t]he fact that the term of a collective bargaining agreement has expired does not mean that there can be no duty to arbitrate issues arising out of that agreement . . . ." *Boston Lodge 264, Intl. Assn. of Machinists* v. *Massachusetts Bay Transp. Authy.,* 389 Mass. 819, 821 (1983). See *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm.,* 398 Mass. 695, 699 (1986); *Commonwealth, Secretary*

*of Admin. & Fin. & MCOFU*, 20 MLC 1087 (1993). See also *Nolde Bros.* v. *Local 358, Bakery & Confectionery Wkrs. Union, supra* at 255. Rights that were violated or "which accrued or vested under the agreement will, as a general rule, survive termination of the agreement." *Litton Fin. Printing Div., Inc.* v. *National Labor Relations Bd.*, 501 U.S. 190, 207 (1991). As the Supreme Judicial Court stated in *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm., supra* at 699, "Since the incident for which the teacher was disciplined took place while the contract was in effect, the dispute . . . arose under the agreement and the teacher was entitled to arbitration pursuant to the terms of the agreement."

Once a new union is certified, however, the decertified union loses all rights to represent the employees in the unit and retains no rights under the collective bargaining agreement. Hardin & Higgins, Developing Labor Law 1006 (4th ed. 2001). Accordingly, the enforcement of contract violations predating the change in union representation is left to the new union, which steps into the shoes of its predecessor. *Cincinnati Newspaper Guild, Local 9* v. *Cincinnati Enquirer, Inc.*, 863 F.2d 439, 445-446 (6th Cir. 1988). Otherwise, there would be no way to enforce the contract rights without prejudicing the employee's right to select new representation. The fact that the new union is not a signatory to the contract is not dispositive. *Ibid.* Compare *John Wiley & Sons* v. *Livingston*, 376 U.S. at 550 (union can arbitrate grievance against successor employer that did not sign the agreement).

In these circumstances, we conclude that the arbitrator's decision on arbitrability exceeded his powers. G. L. c. 150C, § 11(*a*)(3). See *Higher Educ. Coordinating Council/Roxbury Community College* v. *Massachusetts Teachers' Assn./Mass. Community College Council*, 423 Mass. 23, 27 (1996), quoting from *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 792 (1977) ("the question whether the arbitrator[] acted in excess of the authority conferred on [him] . . . is always open for judicial review"). His arbitrability ruling extinguished an otherwise arbitrable grievance arising out of the agreement solely because the employees selected a new collective bargain-

ing representative.[7] The ruling penalized and indirectly intruded on the employees' right to select new union representation, a collective bargaining right that is beyond the arbitrator's powers. Cf. *id.* at 28 (discussing exclusive managerial prerogatives); *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. at 795; *Sheriff of Middlesex County* v. *International Bhd. of Correctional Officers, Local R1-193*, 62 Mass. App. Ct. 830, 831-832 (2005). Compare *Boston* v. *McCarthy*, 5 Mass. App. Ct. 890, 890 (1977) ("We can discern no basis . . . for concluding that that issue was one which could not lawfully be made the subject of arbitration").

The arbitrator's interpretation of the agreement was not based on any specific contractual language, nor has any contractual language supporting his interpretation been brought to our attention by the town. Cf. *Concerned Minority Educators of Worcester* v. *School Comm. of Worcester*, 392 Mass. 184, 188 (1984) (courts must "consider whether an arbitrator's award draws its essence from the collective bargaining agreement"); *School Dist. of Beverly* v. *Geller*, 435 Mass. 223, 228-229 (2001) (Cordy, J., concurring), quoting from *Georgia-Pac. Corp.* v. *Local 27, United Paperworkers Intl. Union*, 864 F.2d 940, 944 (1st Cir. 1988) ("The power and authority of an arbitrator is ordinarily derived entirely from a collective bargaining contract, and he violates his obligation to the parties if he substitutes 'his own brand of industrial justice' . . ."). Rather, his interpretation, which conditions the fundamental right to select union representation, appears to be grounded exclusively in a misreading of labor law cases and statutes. *Massachusetts Bay Transp. Authy.* v. *Local 589, Amalgamated Transit Union*, 406 Mass. 36, 40 (1989) (in determining whether arbitrator exceeded his authority by intruding into nondelegable public managerial rights determined by statute, court need not defer to arbitrator's interpretation of statute). See *School Dist. of Beverly*

---

[7]The logic of his interpretation would also preclude the enforcement of all grievances arising out of the expired contract that do not manifest themselves prior to the transition from one union to the next. It would likewise leave employees unprotected when a union that is decertified is inattentive or management uses the timing of the transition to manipulate contract rights.

v. *Geller, supra* at 230, quoting from *School Comm. of Hanover v. Curry,* 3 Mass. App. Ct. 151, 156 (1975), *S.C.,* 369 Mass. 683 (1976) ("Where the determinations to be made are primarily issues of public law, the arbitrator possesses no special expertise"). Those cases and statutes, as discussed previously, compel rather than preclude arbitration here. See, e.g., *Local No. 1710, Intl. Assn. of Fire Fighters v. Chicopee, supra* at 421.

In sum, we conclude that the Superior Court properly vacated the arbitrator's decision that the grievance was not arbitrable.

B. *The merits of the grievance.* Once the decision was vacated and the case was remanded, the arbitrator proceeded to consider the merits of the grievance itself. We must decide whether the trial court properly affirmed the arbitrator's finding that there was no just cause to terminate Shutt under the contract. This determination involved a core arbitral function, and our review of the arbitrator's factual findings and contractual interpretation is extremely limited. See *Lynn v. Thompson,* 435 Mass. 54, 61 (2001), cert. denied, 534 U.S. 1131 (2002) ("Unlike our review of factual findings and legal rulings made by a trial judge, we are strictly bound by an arbitrator's findings and legal conclusions . . ."). See also *Higher Educ. Coordinating Council/ Roxbury Community College v. Massachusetts Teachers' Assn./ Mass. Community College Council, supra* at 27, quoting from *Concerned Minority Educators of Worcester v. School Comm. of Worcester, supra* at 187 ("[W]e have no business overruling an arbitrator because we give a contract a different interpretation").

The town contends that the arbitration award violated public policy by returning an employee to work despite proof that the employee had secured FMLA leave by deception. The arbitrator, however, essentially concluded that Shutt's injury was serious enough and was sufficiently supported by medical evidence not to constitute an abuse of FMLA leave despite Shutt's exaggeration of his limitations and outright lies. The arbitrator also concluded that it was not unexpected for Shutt's condition to improve during the FMLA leave. It is not our role to reinterpret the facts or to measure the level of misconduct justifying

discipline or discharge under the contract. *Lynn* v. *Thompson, supra* at 61.[8]

*Judgments affirmed.*

---

[8]Pursuant to its cross appeal, the union has also sought attorney's fees because, under Federal labor law, a party may be ordered to pay attorney's fees and costs when "a challenge to an arbitration award is without justification." *International Assn. of Machinists & Aerospace Wkrs., Dist. 776* v. *Texas Steel Co.*, 538 F.2d 1116, 1121 (5th Cir. 1976), cert. denied, 429 U.S. 1095 (1977). See *Crafts Precision Indus., Inc.* v. *Lodge No. 1836, Intl. Assn. of Machinist & Aerospace Wkrs.*, 889 F.2d 1184, 1186 (1st Cir. 1989). Recognizing that there is no precedent to support its argument, WMEA requests that this court create a State analog. We decline to do so.