NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13331

CITY OF CHELSEA  vs.  NEW ENGLAND POLICE BENEVOLENT ASSOCIATION, INC., LOCAL 192.

Suffolk.     January 6, 2023. - March 8, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.

Arbitration, Arbitrable question, Confirmation of award.  Public Employment, Collective bargaining, Termination.  Labor, Collective bargaining, Grievance procedure, Public employment, Arbitration.

Civil action commenced in the Superior Court Department on July 26, 2021.

The case was heard by Patrick M. Haggan, J., on motions for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Strephon Treadway for the plaintiff.
Thomas E. Horgan for the defendant.

KAFKER, J.  After the New England Police Benevolent

Association, Inc., Local 192 (NEPBA), replaced the International

Brotherhood of Teamsters, Local 25 (Local 25), as the exclusive

bargaining representative for the emergency dispatchers in the city of Chelsea (city), the NEPBA sought to arbitrate a grievance regarding the termination of a dispatcher that occurred following the change in union representation. The NEPBA and the city had not yet bargained to a new contract, but employees had been working pursuant to the terms and conditions of the city's prior collective bargaining agreement with Local 25, which contained an arbitration provision. The parties submitted to an arbitrator the question whether the dispute was arbitrable. The arbitrator ruled that it was. The city now appeals from a Superior Court order confirming the arbitrator's decision.

We determine that the dispute was arbitrable because (1) the dispute clearly would have been covered by the broad arbitration provision negotiated by the city and the prior union, if the contract with the city had remained in effect; (2) the arbitrator, acting within her authority, found that the contract was extended by the city according to the terms of the contract, and we defer to such contractual interpretation by the arbitrator; and (3) we conclude that the labor relations act entitles a successor union to "step[] into the shoes of its predecessor" and enforce an arbitration provision in a collective bargaining agreement negotiated by its predecessor.

See Watertown v. Watertown Mun. Employees Ass'n, 63 Mass. App. Ct. 285, 291 (2005) (Watertown).

Background. The city's emergency dispatchers had been represented by Local 25 since 2009. On January 3, 2020, the NEPBA filed a petition to represent the bargaining unit. On January 8, 2020, Local 25 sent a letter disclaiming interest in representing the dispatchers. The NEPBA won the subsequent election unanimously; due to Local 25's disclaimer, it was the only union on the ballot. On April 16, 2020, the Department of Labor Relations certified the NEPBA as the dispatchers' exclusive representative.

The most recent collective bargaining agreement in effect for the dispatchers was negotiated by Local 25. It contained multiple arbitration provisions. One stated that "[o]nly matters involving questions whether the [c]ity is complying with its obligations under this [a]greement, including matters involving the meaning, application or interpretation of the [a]greement" are subject to the grievance and arbitration procedure, except that "[n]o matter shall be subject to the arbitration procedure of this [a]greement which is subject to the authority or jurisdiction of Civil Service or any Retirement Board." More specifically, the agreement also provided: "Any protest against discipline, suspension or discharge shall be

handled under the grievance and arbitration procedure provided for in the agreement."

By its terms, the agreement also had the following duration:

"This [a]greement shall remain in full force and effect from July 1, 2016 until midnight June 30, 2019 and shall terminate unless extended by mutual consent of the parties, or unless either party hereto gives written notice to the other not less than sixty (60) days prior to the date of expiration, of a desire to change or amend the terms or conditions hereof."

The city solicitor wrote to representatives of Local 25 on January 31, 2019 (thus "not less" than sixty days before June 30): "Our agreements expire on June 30, 2019 and I was hoping to schedule our initial meetings for bargaining." Although Local 25 and the city exchanged proposals for a new contract and met several times, they did not reach an agreement. A representative from the NEPBA reached out to start contract negotiations after the union was certified, but by the time of the dispute in question, the parties had not reached an agreement. The city continued to abide by all provisions in the contract during this period of time and apparently has done so to this day, with the exception of the arbitration provision.

Nearly one year after the NEPBA was certified, a dispatcher allegedly failed to properly dispatch a fire response, and then misreported the facts in a subsequent investigation. As a result, the city dismissed her. The union protested the

discipline and invoked the grievance procedure in the collective bargaining agreement, which involves a multistep process that culminates in arbitration.  The relevant contract term states:

> "Grievances not settled in the [s]teps of the grievance procedure may be referred to an arbitrator agreed upon by the parties . . . [or one] designated by the American Arbitration Association . . . .  The decision of the arbitrator within the scope of his authority shall be final and binding upon the parties."

Although the city disputed that it was required to arbitrate the grievance, the parties proceeded to arbitration and submitted to the arbitrator the question whether the dispute was arbitrable.  The arbitrator ruled that it was, because the agreement negotiated by Local 25 was still in effect on February 1, 2021, by its terms.  The arbitrator explained:  "While [the] letter [regarding scheduling bargaining] does not use the exact language of Article 25 [(the duration provision)], I find that it adequately satisfies Article 25, and thus extended that contract."  She also relied on the reasoning of the Appeals Court decision in Watertown discussing the presumption of arbitrability, including when "the arbitration provision being interpreted involves expiring contracts and changes in union representation."  Watertown, 63 Mass. App. Ct. at 290.

The city filed a complaint in the Superior Court to vacate the arbitration award, arguing that the arbitrator exceeded her authority because there was no agreement to arbitrate in effect

once Local 25 disclaimed interest. See G. L. c. 150C, § 11 (a) ("the superior court shall vacate an award if . . . the arbitrators exceeded their powers"). The union moved to confirm the arbitration award. Both parties moved for judgment on the pleadings. The judge confirmed the arbitration award, allowed the union's motion, and denied the city's motion. The judge determined that the collective bargaining agreement, including the arbitration provision, "remained in effect when the arbitration occurred" because a new bargaining representative "'steps into the shoes of its predecessor' for purposes of the [agreement]" (quoting Watertown, 63 Mass. App. Ct. at 291).

The city appealed from the judgment. This court transferred the appeal on its own motion.

Discussion. The well-settled background principles for resolving this case are summarized in the Appeals Court decision in Watertown, and we repeat them here:

> "'The first principle is that "arbitration is a matter of contract"' and cannot therefore be imposed if it is not a part of the bargained-for exchange. [Local No. 1710, Int'l Ass'n of Fire Fighters, AFL-CIO v. Chicopee, 430 Mass. 417, 420-421 (1999), quoting AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986).] Courts recognize, however, that 'a collective bargaining agreement is not an ordinary contract.' [John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 550 (1964).] A collective bargaining agreement governs an entire, evolving labor-management relationship. It is negotiated in a highly regulated environment that determines the certification and decertification of unions and establishes bargaining obligations of unions and employers. A collective bargaining agreement also promotes the equitable,

efficient, and peaceful resolution of workplace disputes. Arbitration provisions play an important part in the entire process, as they provide for the expeditious resolution of workplace disputes by decisionmakers with expert knowledge of the common law of the shop. [United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580-582 (1960).]

"For these reasons, where the collective bargaining agreement 'contains an arbitration clause, there is a presumption of arbitrability in the sense that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage . . . particularly . . . where the clause is . . . broad" (emphasis added).' [Local No. 1710, Int'l Ass'n of Fire Fighters, AFL-CIO, 430 Mass. at 421, quoting AT&T Techs., Inc., 475 U.S. at 649.] In addition, when the arbitration provision being interpreted involves expiring contracts and changes in union representation, courts carefully consider the statutory context in which the agreements are negotiated. See, e.g., [Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 254 (1977)] (discussing how parties drafted their arbitration clause 'against a backdrop of well-established federal labor policy favoring arbitration')."

Watertown, 63 Mass. App. Ct. at 289-290.

In the instant case, there are three interrelated questions. First, is the issue in dispute (the employee discharge) covered by the arbitration provision from the collective bargaining agreement? Second, did the agreement expire or was it extended by the parties? Third, what is the effect of the change in union representation? Although the parties, or at least the city, skip over the first two questions, we address them, as they inform the answer to the

third.  Indeed, it is the breadth of the arbitration provision and the extension of the contract that are the key issues for arbitrability of the dispute, not the change in union representation.

1.  Employee discharge.  The first question is clearly not disputed in the instant case.  The arbitration provision states: "Any protest against discipline, suspension or discharge shall be handled under the grievance and arbitration procedure provided for in the agreement."  The termination of the dispatcher would fit squarely within the language of the arbitration provision if the collective bargaining agreement were still in effect.

2.  Extension of agreement.  The second question regarding the extension or termination of the agreement is also not contested in part, as the city concedes that the contract was extended, but contends that the extension ended upon the change in union representation, which took place one year before the employee was disciplined and sought arbitration.  As the issue the city concedes again informs resolution of the issue the city contests, particularly regarding deference owed to the arbitrator's contractual interpretation, we briefly address it.

Although the question "whether a party has agreed to binding arbitration of a particular dispute is always a question for the court," Massachusetts Community College Council v.

Massachusetts Bd. of Higher Educ./Roxbury Community College, 465 Mass. 791, 795 (2013), threshold or subsidiary questions, such as whether the agreement providing for arbitration has been terminated or extended, are often questions for the arbitrator, particularly under so-called "broad[ly]" drafted arbitration provisions, see Brotherhood of Teamsters & Auto Truck Drivers Local #70 v. Interstate Distrib. Co., 832 F.2d 507, 511 (9th Cir. 1987) (Teamsters). That is because "[t]he disagreement between the parties . . . is not primarily over what the arbitration clause provides, or what its scope is, but rather concerns the effect to be given a letter -- or an exchange of letters -- under the terms of the termination or expiration clause of the parties' collective bargaining agreement. In short, the real dispute is over the proper meaning or interpretation of the termination clause." Id. at 510.

In broadly worded arbitration provisions -- that is, those "covering all disputes concerning the meaning of the terms and provisions of the agreement," Teamsters, 832 F.2d at 510 -- this interpretation is ordinarily left to arbitrators. That is because "[t]he issue involves the interpretation of the expiration or termination provision of the agreement, and standard arbitration clauses ordinarily provide that such interpretations, like all others necessary to the resolution of disputes over the meaning of the contract, shall be made by an

arbitrator."  Id.  See District No. 1, Pac. Coast Dist., Marine
Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Maritime Corp., 815
F.3d 834, 845 (D.C. Cir. 2016) ("If the arbitration provision is
broad, the court presumes that the parties intended to arbitrate
the duration dispute . . ."); Sheet Metal Workers Int'l Ass'n
Local No. 18 -- Wisc., AFL-CIO & Everbrite, LLC, 359 N.L.R.B.
1095, 1096 (2013) (arbitration "agreement provides for the
resolution of contract interpretation disputes" and whether
"agreement was automatically extended . . . by its terms" is
such dispute).

Here, we are likewise dealing with a broadly worded
arbitration agreement:  the agreement provides that "matters
involving questions whether the [c]ity is complying with its
obligations under this [a]greement, including matters involving
the meaning, application or interpretation of the [a]greement,"
are subject to the grievance and arbitration procedure.[1]  See
Massachusetts Correction Officers Federated Union v. Sheriff of
Bristol County, 55 Mass. App. Ct. 285, 288 (2002), quoting
United Steelworkers of Am., 363 U.S. at 585 ("Supreme Court
treated as 'broad' a clause that called for the arbitration of
any differences 'as to the meaning and application of the . . .

---

[1] Matters covered by the civil service or pension laws were
excluded.

Agreement'").  The termination and extension provision is a part of the collective bargaining agreement and was not distinguished from other provisions of the contract.  As interpretation of the contract, including the extension and termination provisions, has been assigned to the arbitrator by the contracting parties, we defer to the arbitrator's interpretation, even if it implicates arbitrability.  We distinguish this from when an arbitrator relies on public law rather than the contract itself, in which case we do not defer.  School Comm. of Lexington v. Zagaeski, 469 Mass. 104, 112 (2014), quoting School Dist. of Beverly v. Geller, 435 Mass. 223, 229-230 (Cordy, J., concurring) (although "an arbitrator may be uniquely qualified to interpret the 'law of the shop,'" courts are "better positioned to interpret the 'law of the land'"); Watertown, 63 Mass. App. Ct. at 292 ("The arbitrator's interpretation of the agreement was not based on any specific contractual language, nor has any contractual language supporting his interpretation been brought to our attention by the town").

Here, the arbitrator determined that the collective bargaining agreement had been extended and was still in effect, more than one year after the change in representation, on the date of the February 1, 2021 incident.  She explained that the agreement contained a specific duration term with "key language":  it would terminate on June 30, 2019, unless extended

by mutual consent or if "either party hereto gives written notice to the other not less than sixty (60) days prior to the date of expiration, of a desire to change or amend the terms or conditions."[2]  The arbitrator found that this condition was satisfied via the city solicitor's e-mail message to the union on January 31, 2019, not less than sixty days before the deadline, where she stated that she "was hoping to schedule our initial meetings for bargaining."  The city apparently did not contest the determination of extension either at arbitration or before the Superior Court judge, except to argue that the extension terminated once there was a change in representation: the arbitrator stated that "[t]he [c]ity provide[d] no answer . . . in its brief" to her analysis that the notice extended the contract; and the judge observed that "[t]he [c]ity concede[d] that by its own terms the [agreement] was extended beyond its nominal termination date by the [c]ity's conduct and therefore

---

[2] This is a type of "evergreen" clause:  language in a collective bargaining agreement providing that the terms will remain in effect while the parties negotiate a new contract. Because the statute limited the express term of a collective bargaining agreement to three years, G. L. c. 150E, § 7 (a), this court ruled that an agreement could not be extended beyond three years via an evergreen clause, see Boston Hous. Auth. v. National Conference of Firemen & Oilers, Local 3, 458 Mass. 155, 164 (2010).  However, the Legislature subsequently amended the statute to expressly allow such provisions.  See G. L. c. 150E, § 7 (a), as amended through St. 2011, c. 198, § 1; State Police Ass'n of Mass. v. Alben, 97 Mass. App. Ct. 366, 372 (2020).

[did] not argue that the arbitration was invalid because the [agreement] had expired."

The arbitrator appeared to consider the change in representation to be of no import regarding her interpretation of the continuation of the contract.  For support, she drew on the Appeals Court decision in Watertown.  Although we do not second-guess her interpretation of the agreement or the law of the shop, we do not defer to her additional reliance on public law, including the correct application of the Appeals Court decision in Watertown, on an issue concerning arbitrability. See Zagaeski, 469 Mass. at 111-112; Watertown, 63 Mass. App. Ct. at 289.  We agree with her analysis on this issue as well, for the reasons discussed infra, but we nonetheless owe her no deference in this regard as this raises a public law issue regarding arbitrability, which must be decided by the court. See Zagaeski, supra at 112.  See also John Wiley & Sons, Inc., 376 U.S. at 546-547 (requiring court and not arbitrator to decide whether arbitration clause in collective bargaining agreement survives corporate merger).[3]

---

[3] Finally, we note that the arbitrator's decision is further supported by the city's recognition that all the other provisions in the contract continued in force to this day, as confirmed by counsel at oral argument.

3.  Change in union representation.  Because the agreement negotiated by Local 25 had been extended, it was still in effect when the NEPBA sought to arbitrate a dispatcher's termination. The question then becomes whether a union can enforce an arbitration agreement against an employer, when the employer agreed to arbitrate with the predecessor union but not the successor union.[4]

---

[4] This issue has not been consistently resolved under analogous Federal law.  The National Labor Relations Board (NLRB) has ruled that after a change in union representation, "the new union may not compel the employer to arbitrate," because the employer did not consent to arbitrate with that union -- although the employer must still arbitrate with the predecessor union grievances that arose before the change in union representation.  Children's Hosp. & Research Ctr. of Oakland & Serv. Employees Int'l Union, United Healthcare Workers -- W., 364 N.L.R.B. 1677, 1680 (2016), citing Arizona Portland Cement Co. & Local 296, Indep. Workers of N. Am., 302 N.L.R.B. 36 (1991).  However, Federal courts have found that a successor union can compel the employer to arbitrate pursuant to the previous agreement.  See Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc., 863 F.2d 439, 445-446 (6th Cir. 1988) (Cincinnati Newspaper) (employees' right to arbitrate "may not be abrogated by the employer merely because the employees subsequently see fit to change their agent"); Local No. 503 of the Graphic Communications Conference of the Int'l Bhd. of Teamsters vs. Cascades Containerboard Packaging, U.S. Dist. Ct., No. 17-cv-6605 (W.D.N.Y. Dec. 19, 2017) (following Cincinnati Newspaper but denying relief on other grounds); General Teamsters Union Local No. 439 vs. Sunrise Sanitation Servs., Inc., U.S. Dist. Ct., No. S-05-1208 (E.D. Cal. Apr. 25, 2006). The NLRB rule would create the awkward situation where the employees vote out a union but must still rely on it for arbitrations.  Worse, if applied to cases like this one, where a grievance arises after a change in representation, employees would appear to lack any right to arbitrate grievances.

In a similar context in Watertown, the Appeals Court ruled that when the grievance arises before a change in union representation, the employer must arbitrate it with the successor union, because the successor union "steps into the shoes of its predecessor." Watertown, 63 Mass. App. Ct. at 291. In that case, as in this one, the previously negotiated contract had been extended by an evergreen clause. Id. at 288. As the agreement was in effect when the grievance occurred, the situation is similar: the successor union simply seeks to enforce an arbitration agreement negotiated with its predecessor.

We determine that the employer must arbitrate the grievance, as it has agreed to do so via the collective bargaining agreement, and the successor union steps into the shoes of its predecessor. This conclusion is supported by three aspects of the labor relations act. First, the statute favors arbitration as a means of resolving employment disputes once parties have agreed that the disputed matters are subject to arbitration. See G. L. c. 150E, § 8. At that point, the presumption in favor of arbitration applies and "[d]oubts should be resolved in favor of coverage." Local No. 1710, Int'l Ass'n of Fire Fighters, AFL-CIO, 430 Mass. at 421, quoting AT&T Techs. Inc., 475 U.S. at 649.

Second, the statute provides for employees' free choice in union representation. "[M]ajority rule is a fundamental aspect of American democratic government" and Massachusetts labor policy. Branch v. Commonwealth Employment Relations Bd., 481 Mass. 810, 827 (2019), cert. denied, 140 S. Ct. 858 (2020). To preclude a successor union from arbitrating grievances would "penalize[] and indirectly intrude[] on the employees' right to select new union representation," by forcing them to choose between giving up their bargained-for grievance process or sticking with a disfavored union. Watertown, 63 Mass. App. Ct. at 292. The same principles apply here, even though Local 25 sent a letter disclaiming interest rather than losing an election. The dispatchers unanimously selected the NEPBA as their bargaining agent, evidencing their desire to continue being represented by a union. Their right to arbitrate grievances cannot be revoked just because they have switched representatives.

Third, an employer cannot unilaterally change terms and conditions of employment. "[T]he public employer and the employee organization" must "negotiate in good faith" over "terms and conditions of employment." Somerville v. Commonwealth Employment Relations Bd., 470 Mass. 563, 569 (2015), quoting G. L. c. 150E, § 6. It is a "prohibited practice" under G. L. c. 150E, § 10 (a) (5), for a public

employer to make a unilateral change to a mandatory subject of bargaining without first bargaining to impasse.  See Somerville, supra at 570.  The terms of a grievance procedure for employment disputes that culminates in arbitration is such a mandatory subject.  See School Comm. of Newton v. Labor Relations Comm., 388 Mass. 557, 563 (1983) (implementation of employee terminations "involved the very essence of the relationship, the employment itself, and not a peripheral matter").  See also 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 256 (2009) (arbitration is mandatory subject under Federal labor law).  Thus, until the successor union and the city agree to a new contract or bargain to impasse, all the key terms and conditions of the prior contract must remain in effect, including the arbitration provision.

Conclusion.  The dispute at issue was covered by the arbitration provision contained in the contract negotiated by the city and the union that previously represented the bargaining unit.  As found by the arbitrator within her authority to interpret the contract and the law of the shop, the contract, including the grievance and arbitration provision, was extended and not terminated by the city.  Finally, we conclude that the labor relations act empowers the successor union to step into the shoes of its predecessor and enforce the provisions of the extended contract, including its arbitration

provisions.  For all of these reasons, we affirm the judge's order granting the NEPBA's motion for judgment on the pleadings, denying the city's motion for judgment on the pleadings, and confirming the arbitration award.

<u>So ordered</u>.